**Reuben GLASS, et al, Plaintiffs,**

v.

**CITY OF PHILADELPHIA, et al, Defendants.**

No. CIV.A. 99–6320.

United States District Court, E.D. Pennsylvania.

Oct. 10, 2006.

304

David E. Jokelson, Neil E. Jokelson, Neil E. Jokelson & Assoc., PC, Derek Jokelson, Jokelson & Associates, Philadelphia, PA, for Plaintiffs.

Denise S. Wolf, U.S. Attorney's Office, Edward D. Chew, Jr., Robin B. Arnold,

City of Philadelphia Law Dept., Philadel-
phia, PA, for Defendants.

OPINION

EDUARDO C. ROBRENO, District
Judge.

## TABLE OF CONTENTS

I. PROCEDURAL HISTORY ............................................310

II. INTRODUCTION ................................................311

III. BACKGROUND ................................................312

IV. FINDINGS OF FACT ...........................................316
 A. Glass I ...................................................316
 B. Glass II ..................................................317
 1. Activity in the vacant lot across from the Glass house ..................317
 2. January 1, 1998 arrest of Kareem ...............................318
 a. IAD 98–04 ...........................................318
 b. Mr. Glass's statements to Lieutenant Lampe and Sergeant
 Craighead ..........................................318
 3. February 10, 1998 arrest of Mr. Glass and Kareem ..................319
 a. February 12, 1998 meeting ..............................322
 b. IAD 98–132 .........................................323
 4. The *Glass I* trial begins and Kareem is arrested .................324
 a. The Derek Bohannon case and word of Kareem's impending
 arrest during the trial of *Glass I* ............................324
 i. The Bohannon complaint ................................324
 ii. The arrest warrant ....................................325
 b. Settlement and release of *Glass I*..........................326
 5. August 31, 1998 arrest of Kareem ..............................327
 6. September 16, 1998 conflict with Officer McKenny and IAD 98–369.....327
 7. The FTA bench warrant in the Bohannon case ......................328
 a. The warrant system ...................................329
 b. November 22, 1998 arrest and IAD 98–502 ....................330
 c. December 22, 1998 arrest and IAD 98–527......................331
 d. December 30, 1998 arrest and IAD 99–02.......................332
 e. January 13, 1999 arrest and IAD 99–037 .......................333
 8. Officers announce Kareem's arrest over the loudspeaker and IAD
 99–028...............................................333
 9. Mr. Glass's dealings with the Philadelphia Parking Authority and
 IAD 99–023 ..........................................334
 C. Summary..................................................335

V. CONCLUSIONS OF LAW AND DISCUSSION ...........................337
 A. The Scope of the Release ....................................337
 B. Section 1983 Liability ......................................340
 1. Municipal liability under § 1983.................................340
 a. Municipal liability from the police commissioner ...................342
 b. Municipal liability from the policy or custom of "investigatory
 detentions" .........................................344
 c. Municipal liability for the inadequate investigation of citizens'
 complaints .........................................348
 2. Liability of the individual officers under § 1983 .....................349
 a. Abuse of process .....................................349
 b. Excessive force, warrantless search and arrest without probable
 cause ............................................351
 i. Excessive force .......................................351

 ii. Warrantless search ...................................... 353
 iii. Arrest without probable cause ............................ 356
 c. Civil conspiracy ............................................ 357
 d. Supervisory liability ........................................ 362
 C. Section 1985(2) Liability ......................................... 364
 D. Section 1986 Liability ........................................... 365
 E. Plaintiffs' State Law Claims ...................................... 365
 1. False arrest and false imprisonment ........................... 365
 2. Assault and battery ......................................... 365
 F. Ms. Malloy's Claims ............................................ 366

VI. CONCLUSION ........................................... 367

VII. DAMAGES ............................................... 367

## I. PROCEDURAL HISTORY

On December 10, 1999, plaintiffs Reuben Glass, his son Kareem Glass,[1] and their family friend Jane Malloy filed this action against the City of Philadelphia and nineteen individual police officers[2] alleging violations of their civil rights and the commission of sundry state-based torts.[3]

**1.** For the sake of clarity, the Court will refer to Reuben Glass as "Mr. Glass" and Kareem Glass as "Kareem" throughout this opinion. Collectively with Ms. Malloy, they are referred to as "plaintiffs." The Court, however, addresses Ms. Malloy's claims separately in its Conclusions of Law.

**2.** The individual defendants include Philadelphia Police Department officers and detectives, unidentified police personnel (i.e., "John Doe # 1–8" and "Richard Roe # 1–20"), and Elizabeth Echevaria of Echevaria's Dollar Depot. Defendant Elizabeth Echevaria was terminated on July 23, 2001 (doc. no. 34). On September 10, 2001, the Court dismissed, without prejudice, the claims against the "John Doe" defendants (doc. no. 46). On March 2, 2006, by stipulation of the parties, the Court dismissed with prejudice the claims against Lieutenant Robert Nudd, Detective Elizabeth Dotchel, Officer Frederick Simpkins and Officer Michael Livewell (doc. no. 173). All of the named defendants are referred to collectively as "defendants."

**3.** Plaintiffs have brought the following seven counts:

(1) All plaintiffs have brought a 42 U.S.C. § 1983 claim against defendant City of Philadelphia.

Plaintiffs allege that on July 10, 1995, Kareem, then a minor, was beaten by Philadelphia police officers while playing at a construction site at the corner of Uber and Parrish Streets. Based on this incident, Mr. Glass, Kareem's father, filed a lawsuit on April 4, 1996, on behalf of Kareem, against the City of Philadelphia and police

(2) All plaintiffs have brought a 42 U.S.C. § 1983 claim against all remaining defendants.

(3) All plaintiffs have brought an assault and battery claim against all defendants.

(4) Plaintiffs Reuben Glass and Kareem Glass have brought a false arrest and false imprisonment claim against all defendants.

(5) All plaintiffs have brought a conspiracy claim pursuant to 42 U.S.C. § 1985(2) against all individual defendants.

(6) All plaintiffs brought a conspiracy claim pursuant to 42 U.S.C. § 1985(3) against all individual defendants, which is no longer before the Court. Trial Tr. 49:19–24, June 28, 2006.

(7) All plaintiffs have brought a conspiracy claim pursuant to 42 U.S.C. § 1986 against defendants Captain Ditchkofsky, Inspector Tiano, Lieutenant Lampe and Sergeant Craighead.

Compl. ¶¶ 118–40. The only allegation involving the race of plaintiffs or defendants was under § 1985(3), which is no longer before the Court. As a general matter, however, plaintiffs Mr. Glass and Kareem are African American and Ms. Malloy is Caucasian. The defendants include both African American and Caucasian police officers.

officers in the Ninth District of the Philadelphia Police Department. *Glass v. City of Philadelphia,* 96–2752 [hereinafter "*Glass I* "]. That lawsuit eventually settled on May 8, 1998.

On December 10, 1999, plaintiffs Mr. Glass, Kareem and Ms. Malloy, a family friend, brought the instant action, *Glass v. City of Philadelphia,* 99–6320 [hereinafter "*Glass II* "]. Plaintiffs contend that, beginning in August 1997 and continuing through 1999, members of the Philadelphia Police Department's Ninth District harassed and intimidated the Glasses in retaliation for filing the lawsuit in *Glass I* against the City of Philadelphia and certain police officers. Allegedly, members of the Ninth District, at various times, stalked, harassed, falsely incriminated and threatened to kill plaintiffs in retaliation for the Glasses' exercising their civil rights.[4]

The instant action, *Glass II,* was tried non-jury in a trial that began on January 18, 2006 and lasted six weeks.[5] This memorandum contains the Court's findings of fact and conclusions of law.

## II. INTRODUCTION

In reaching its findings of fact and conclusions of law, in addition to hearing live testimony from 49 witnesses at trial, the Court also waded through the testimony of the inchoate *Glass I* trial, the deposition testimony of several witnesses and hundred of exhibits. In addition to trial, much like counsel in the case, the Court has "lived" through numerous hearings and arguments, and reviewed hundreds of pages of legal arguments over the past ten years.[6]

Ultimately, what emerges are sharply contrasting versions of events which are, on all material points, largely irreconcilable. Each plaintiff and each defendant viewed his or her conduct as wholly justified and entirely free of fault. Concomitantly, all involved attributed to those on the other side wrongful intent and malice. All involved had a strong motive to fabricate. Plaintiffs wanted vindication and a financial recovery. Defendants wanted to preserve their professional reputations and avoid a financial judgment. In their testimony, the party witnesses stuck closely to their stories and yielded no quarter. Each act or event was viewed, by each party, through a prism of suspicion and mistrust. Under these circumstances, the testimony of fact witnesses presented at trial is highly questionable.

---

4. Defendants moved for partial summary judgment on December 13, 2002 (doc. no. 69). In denying this motion, the Court stated that genuine issues of material fact existed as to whether defendants' conduct legally caused (1) plaintiffs' witnesses to be unavailable to testify at trial, (2) plaintiff Kareem Glass to be unavailable for trial, or (3) plaintiffs' expert witnesses to be unavailable for trial (doc. no. 75). Defendants again moved for summary judgment on October 25, 2005 based upon the release signed as part of the settlement in *Glass I.* The Court denied the second motion for summary judgment, finding that the release was ambiguous.

5. On January 12, 2005, plaintiffs submitted a letter to the Court on behalf of all parties, requesting that the instant action be tried non-jury before the Court. Letter from Neil Jokelson, Plaintiffs' Counsel, to Judge Eduardo C. Robreno (Jan. 17, 2006), Doc. No. 144. The Court conducted an on-the-record colloquy with the plaintiffs and counsel for the City regarding their decision to proceed non-jury. During that colloquy, the Court discussed its involvement in the settlement of *Glass I* with the parties. Trial Tr., Jan. 17, 2006. Thereafter, the parties signed a written waiver of a jury trial. Doc. nos. 147, 148, 149.

6. The Court is grateful for the exemplary conduct and vigorous but professional advocacy of counsel for both plaintiffs and defendants in the case throughout the entire course of this litigation.

To compound matters, at closing argument and in their voluminous proposed findings of fact and conclusions of law submitted at the end of trial, counsel pressed upon the Court a lengthy deconstructed version of the record. Under this approach, counsel scoured the voluminous record for citations to disparate and isolated pieces of evidence, as if each fact stood separate from the others. The result is that, by emphasizing the "trees," the parties ultimately lost sight of the "forest."

Under these circumstances, in determining credibility, the Court's task is twofold. One, to search the record for objective evidence, which confirms or corroborates testimony. Two, to avoid extreme deconstruction of the record, i.e. viewing pieces of evidence or an answer during lengthy testimony in isolation or apart from the other evidence. Rather, the Court's task is to view the evidence as a whole in light of common sense and human experience. It is not the Court's role to disprove every assertion made by the parties or negate every piece of evidence offered in support. Rather, the Court's role is to search for unity from the entire body of evidence which, as a whole, points to what is more likely than not to have occurred in this case.[7]

## III. BACKGROUND

The plaintiffs' complaints against the City of Philadelphia and various members of the Philadelphia Police Department involve allegations of misconduct and harassment by the officers at nearly every level of the Police Department, as well as a conspiracy to cover up that conduct when formally submitted for investigation by plaintiffs. Because the case implicates the interactions between police officers and their supervisors, as well as a detective not assigned to the Ninth District, a basic understanding of the Philadelphia Police Department's hierarchy, particularly that of the Ninth District and the Internal Affairs Division, is necessary. In addition, an appreciation of the policies and procedures for making and investigating a citizen's complaint in place at the time of the relevant events in this case is also necessary.

The Philadelphia Police Department is organized and administratively operated through 25 police districts. The Ninth District, headquartered at 401 North 21st Street, comprises a geographical area of the City of Philadelphia which stretches from north to south between Poplar and Lombard Streets and east to west between Broad Street and the Schuykill River. Trial Tr. 69:15–17, Jan. 31, 2006. Police Districts are grouped into divisions. The Ninth District is part of the Central Police Division, which also includes the Sixth District, the Twenty–Second District, the Twenty–Third District, the Center City District and the Transit Unit. Trial Tr. 103:24–104:1, Feb. 1, 2006. Each police district is organized hierarchically, from the lowest rank of patrol officer, up through corporal, sergeant, lieutenant and then captain. Beyond the district level, the chain of command includes inspector (who usually heads a division), chief inspector, deputy commissioner and ends at the rank of police commissioner. Trial Tr. 39:20–23, Jan. 31, 2006. Police detectives, unlike regular police officers, are assigned to divisions and not to individual police districts, and are subject to a different

---

7. For these reasons, the Court's findings of fact are in narrative form, rather than numbered paragraphs as presented by the parties in their proposed findings of fact. The narrative form is more conducive to the Court's end goal of viewing the evidence as a whole, rather than in parts. To that end, the Court's findings of fact present a narrative version of events that the Court has found more likely than not to have occurred.

chain of command. The Central Detectives Division, however, which is relevant to this action, is physically housed within the same building as the Ninth District.

Also at issue is the conduct of officers and supervisory personnel in the Internal Affairs Division ("IAD"). The IAD investigates complaints and allegations of misconduct against police officers, including criminal allegations and allegations of drug use, administers drug tests and other integrity tests and conducts audits of documents and procedures of the Police Department. Trial Tr. 8:12–18, Feb. 15, 2006, vol. I. IAD is governed by and reports directly to the Deputy Commissioner of Internal Affairs. As described by former IAD Deputy Commissioner John Norris, IAD is "basically out there to protect the community against rogue or unfair conduct by police officers and also to protect police officers against unfair complaints against them." Trial Tr. 8:18–21, Feb. 15, 2006, vol. I.

Under the policies in place during the relevant time period, IAD accepted all complaints, whether written on the citizen's complaint form distributed by the Police Department, sent via letter or made through an anonymous telephone call. Trial Tr. 9:24–10:2, Feb. 15, 2006, vol. I. Complaints could be made to IAD directly or within the individual police districts,[8] which then forwarded the complaints to IAD. Trial Tr. 11:22–12:10, Feb. 15, 2006, vol. I. IAD then determined whether the particular complaint would be investigated by IAD or whether it would be sent to a district captain for investigation. Trial Tr. 12:12–21, Feb. 15, 2006, vol. I. At all relevant times, in addition to its five investigative teams, IAD also had special teams that were assigned investigations for certain districts/geographical areas of the city. Trial Tr. 119:1–21, Feb. 15, 2006, vol. I.

As a matter of then existing practice, verbal abuse and lack of service complaints were customarily delegated to the district captains for investigation. In turn, the district captain could assign certain investigative tasks to a lieutenant. Other, more serious complaints were investigated by IAD personnel.[9] Trial Tr. 19:3–14, Feb.

---

**8.** Each individual police district has a "window" where a police officer receives citizens who walk into the districts in need of assistance. The citizen's complaint forms are located at these windows and can be returned to the window when completed.

**9.** Deputy Commissioner Norris explained the IAD investigation process for complaints investigated by IAD and those sent to the districts for investigation during the relevant time period, from 1998–99. Upon receipt of a complaint, IAD would assign the complaint to be investigated by a team within IAD. Once assigned to a captain, the complaint "went down to the lieutenant or sergeant, [who] did the bulk of the investigation," such as "interviews, . . . collecting of evidence and things of that nature." Trial Tr. 121:21–122:23, Feb. 15, 2006, vol. I. Upon completion of the investigation, the captain and the lieutenant would sign off on the investigation and submit the investigation report to the inspector. If

there was a question about the investigation or a deficiency in the investigation, the investigation report was sent back to the investigating officer for review, which could result in anything from a verbal response to a change in the investigation report. The inspector would sign the last page of the report, which stated the conclusion of the investigation. Then the deputy commissioner of IAD and the police commissioner "would sign the front of the investigation [report]." Trial Tr. 122:18–22, Feb. 15, 2006, vol. I. According to Deputy Commissioner Norris, IAD handled roughly one thousand complaints each year in 1998 and 1999. Trial Tr. 123:3, Feb. 15, 2006, vol. I.

Complaints assigned to the districts for investigation followed essentially the same process. The district captains would delegate the task of conducting the investigation, such as interviewing the complainant and witnesses, to a lieutenant. The captain was still responsible for signing off on the investigation. The

15, 2006, vol. I. A verbal abuse complaint involves allegations that an officer used inappropriate or offensive language, used profanity or made a "smart-aleck" remark. Trial Tr. 20:7–14, Feb. 15, 2006, vol. I. Verbal abuse is a broad term used to refer to any situation where an officer "verbally may have gone over the edge in a professional manner." Trial Tr. 20:15–16, Feb. 15, 2006, vol. I. A lack of service complaint involves allegations that an officer did not do what he or she was required to do under the regular and accepted procedure in a particular situation. Trial Tr. 20:20–23, Feb. 15, 2006, vol. I. At all relevant times, it was customary for the supervisor, such as the lieutenant or captain, of the officer named in the complaint to address and/or investigate these types of matters. Trial Tr. 3:24–33:1, Feb. 15, 2006, vol. I. The supervisors "are supposed to train, counsel and discipline their own officers." Trial Tr. 33:2–5, Feb. 15, 2006, vol. I. This process embodies the well-settled principle of the chain of command.

Each month during the relevant time period, the commanding officers of every district and division of the Police Department attended a CompStat meeting in the auditorium of the Police Academy. Trial Tr. 24:2–11, Feb. 1, 2006. The police commissioner and deputy commissioners attended the meetings. Trial Tr. 24:10–20, Feb. 1, 2006.

The CompStat meetings addressed, *inter alia*, the crime rate in each district and measures to affect that crime rate, police automobile accidents, complaints against police officers [10] and overtime budgets. Trial Tr. 24:2–6, Feb. 1, 2006.

In addition to plaintiffs and a small number of civilian witnesses, much of the trial testimony was provided by Philadelphia police officers who were assigned to the Ninth District or to IAD. To assist the reader, the following is a list of persons involved in the years-long conflict between the Glass family and certain Ninth District police personnel.

---

investigation report was then submitted to IAD, where an inspector would sign off on the investigation report and send it up the chain of command to the deputy commissioner of IAD and then to the police commissioner. Again, if there were any questions or deficiencies in the investigation, it would be sent back for review.

If the allegations in a citizen's complaint were not sustained as a result of the investigation, the complaint would go through the police district's chain of command and be reviewed with the officer against whom the complaint was made. Trial Tr. 123:4–12, Feb. 15, 2006, vol. I. If the allegations in a citizen's complaint were sustained by the investigation, the report also would travel through the police district's chain of command to the officer's commanding officer, "who then had to make the determination of what type of discipline was appropriate for that case." Trial Tr. 123:16–22, Feb. 15, 2006, vol. I. Deputy Commissioner Norris explained that discipline could be exacted in several ways: "A captain could do training, counseling, or he could do formal discipline

where he took the [officer] to the Police Board of Inquiry ... [to] decide what was to be done with the officer[ ], whether it be a suspension or reprimand or whatever." Trial Tr. 124:1–5, Feb. 15, 2006, vol. I. The only role IAD had in a Police Board of Inquiry process was to testify regarding the investigation. Trial Tr. 124:7–9, Feb. 15, 2006, vol. I.

10. At trial, the testimony on this point was in conflict. Testimony about the CompStat meetings was adduced by plaintiffs to show that the alleged harassment of plaintiffs was known at the highest level of the Police Department. Captain Ditchkofsky remembers hearing the Glass name mentioned during CompStat meetings. Deputy Commissioner Norris stated that IAD policy did not allow complainants' names to be mentioned during meetings, but rather the discussions concerning complaints would be very generic. Trial Tr. 94:5–95:11, Feb. 15.2006, vol. I. Therefore, neither of the witnesses' testimony confirmed or denied this point.

The plaintiffs in the instant action, *Glass II*, are:

1. Reuben Glass;
2. Kareem Glass; [11] and
3. Jane Malloy.

The defendants in the instant action, *Glass II*, are [12]:

4. Inspector James Tiano, Inspector of the Central Police Division during the time in question;
5. Captain Leonard Ditchkofsky, Captain of Ninth District during the time in question;
6. Lieutenant Bruce Lampe, of the Ninth District;
7. Sergeant Michael Craighead, of the Ninth District;
8. Officer Lawrence McKenny, of the Ninth District;
9. Officer David Marcus, of the Ninth District;
10. Officer Donnie Rockeymore, of the Ninth District;
11. Officer Thomas Vales, of the Ninth District;
12. Officer James Barrett, of the Ninth District;
13. Officer Kenneth Gill, of the Ninth District;
14. Officer James Campbell, of the Ninth District; and
15. Detective Sean Brennan, of the Central Detectives Division.

Other Police Department personnel who, although not parties to the instant action, testified at trial concerning the Glass family's interaction with the Police Department are:

16. Deputy Commissioner John Norris, the Inspector and then Deputy Commissioner of IAD during the relevant time period;
17. Detective Elizabeth Dotchel, of the North Central Detective Division;
18. Lieutenant Robert Nudd, of the Ninth District;
19. Lieutenant Gary Blackwell, of IAD;
20. Lieutenant Joseph Sweeney, of IAD;
21. Lieutenant Joseph Lapetina, of the Philadelphia Crime Information Center;
22. Officer Robert Auman, of the Sixth District;
23. Sergeant Connie Hurst, of IAD;
24. Officer Ramon Addison, of the Ninth District, who was a defendant in *Glass I*;
25. Officer David Mohammed, of the Ninth District, who was a defendant in *Glass I*;
26. Officer Stephen Williams, of the Ninth District, who was a defendant in *Glass I*;
27. Officer Jose Novoa, of the Ninth District, who was a defendant in *Glass I*;
28. Walter Blichasz, police communications dispatcher;

11. Although physically located within Philadelphia, Kareem was not called to testify at trial in *Glass II*. Plaintiffs' counsel represented to the Court that Kareem had no recollection of the events about which he would be called to testify at trial. In addition, counsel alleged that Kareem suffered from a cognitive disability as a result of injuries sustained during the 1995 beating, which would have hindered his ability to testify. In lieu of live testimony, the Court admitted Kareem's deposition into evidence.

12. All individuals are listed according to their rank within the Philadelphia Police Department during the time period relevant to the events in the instant case. The names otherwise appear in no particular order.

29. Captain James Moriarty, of Internal Investigations Unit, a division of IAD;

30. Sergeant Frank Banford, of Internal Investigations Unit, a division of IAD;

31. Lieutenant William McCarthy, of IAD;

32. Officer Gregory Welsh, of the Ninth District;

33. Officer Raymond Andrejczak, of the Ninth District; and

34. Captain William D. Markert, of IAD.

In addition, there were civilian witnesses who testified as to certain interactions between the Glass family and certain members of the Philadelphia Police Department:

35. Leonard Armstrong, Deputy Director for Active Criminal Records in the Court of Common Pleas, Philadelphia County;

36. Shelley Smith, of the Philadelphia City Solicitor's Office;

37. Michael Resnick, of the Philadelphia City Solicitor's Office;

38. City Councilman Darrell Clarke, a friend of Mr. Glass;

39. Judge Bernice DeAngelis, Ms. Malloy's sister;

40. Frederick Snead, a friend of Mr. Glass;

41. Joseph Russell, a friend of Mr. Glass;

42. Inez Glass, Mr. Glass's daughter;

43. David Bullock, Mr. Glass's son-in-law;

44. Alberta Fisher, Mr. Glass's niece;

45. Andrew C. Verzilli, forensic economist;

46. Betsy Bates, rehabilitation nurse;

47. Peter J. Lento, vocational consultant;

48. Elizabeth Anne McGettigan, certified nurse life care planner;

49. Marc A. Weinstein, registered forensic economist; and

50. Dr. Robert Wolf, vocational rehabilitation economist.

## IV. FINDINGS OF FACT

### A. Glass I

According to plaintiffs, the alleged harassment began as a result of the *Glass I* lawsuit against certain Ninth District officers. In *Glass I,* plaintiffs alleged Kareem was beaten by Philadelphia police officers on or about July 10, 1995 while playing at a construction site at the corner of Uber and Parrish Streets. As a result of the beating, according to plaintiffs, Kareem suffered severe brain damage and serious mental deficiencies. At the time of the incident, Kareem was 15 years old.

*Glass I* went to trial on May 5, 1998. On May 6, 1998, out of the presence of the jury, defense counsel Shelley Smith provided to the Court information that she had received from an unidentified police source that Kareem was going to be arrested at the Federal Courthouse based on a warrant issued in connection with an unrelated case. The following day, May 7, 1998, and as arranged through counsel, Kareem self-surrendered to Central Detectives.

On the same date that it was reported that Kareem was to be arrested in Court, May 6, 1998, the parties entered into settlement discussions. On May 7, 1998, the parties continued with trial, presenting witnesses for direct and cross examination by counsel. The next day, on May 8, 1998, the parties advised the Court that they had reached an agreement whereby the City would pay Kareem $325,000 in exchange for a release. On May 29, 1998,

Kareem signed the release, which states, in relevant part:

### GENERAL RELEASE

For and in consideration of the sum of THREE HUNDRED TWENTY–FIVE THOUSAND DOLLARS AND NO CENTS ($325,000.00), KAREEM GLASS and his attorney Neil Jokelson, Esquire do hereby remise, *release* and forever discharge the City of Philadelphia, its agents, servants, workers or employees and any other persons, associations or organizations, whether known or unknown, foreseen or unforeseen of all actual and/or potential liability accrued and hereafter to accrue on account of and from all, and all manner of, actions and causes of action, claims and demands whatsoever either in law or equity, **for a claim arising from an incident at Uber & Parrish Streets on July 10, 1995,** as stated in plaintiffs' claim, which is against the said City of Philadelphia, its agents, servants, workers or employees, **I, KAREEM GLASS Claimant(s),** ever had, now have, or which my heirs, executors, administrators or assigns, or any of them, hereafter can, shall or may have, for, or by reason of any cause, matter, or thing whatsoever arising from the above accident or incident(s).

Gen. Release, May 29, 1998 (emphasis in original).

### B. Glass II

The instant case before the Court, *Glass II,* was filed on December 10, 1999, a year and a half after the settlement agreement was reached in *Glass I.* The instant case involves allegations of harassment that occurred both before and after the trial in *Glass I* and the subsequent settlement and release of those claims. In essence, the complaint alleges a pattern of harassment against Mr. Glass and his family at the hands of Ninth District police officers beginning in August 1997, and continuing through at least January 1999.

Each of the incidents alleged by plaintiffs to constitute harassment, whether in isolation or as part of a pattern, will be explained in detail.

### 1. *Activity in the vacant lot across from the Glass house*

Beginning around August, 1997, Mr. Glass claims that Ninth District police officers engaged in a series of harassing acts aimed at him near his residence. Mr. Glass testified that police cars would park in the vacant lot across the street from his house and, on occasion, shine the spotlight attached to the police car or the flashing lights in the direction of Mr. Glass's house. Trial Tr. 26:9–30:11, Jan. 18, 2006. Mr. Glass also testified that Officers Marcus and McKenny stared at Mr. Glass and Kareem with "smirks on their faces." Trial Tr. 27:3, Jan. 18, 2006. Inez Glass and her husband David Bullock, testified that they too observed this type of activity in the lot across from Mr. Glass's home. Trial Tr. 6:16–18:9, Feb. 28, 2006.

Officer McKenny, one of the officers allegedly engaged in the acts on the vacant lot, explained that the lot across from Mr. Glass's home is located at a central location within the Ninth District and was an informal meeting place for officers on duty, and concluded that on occasion he may have parked on the lot. Trial Tr. 84:13–23, Feb. 17, 2006. Officer McKenny denied shining the spotlight at Mr. Glass's home. Trial Tr. 98:19–21, Feb. 17, 2006. Officer Marcus denied ever parking on the lot across from the Glass house. Trial Tr. 13:1–5, Feb. 17, 2006.

### 2. January 1, 1998, arrest of Kareem

On January 1, 1998, Kareem was stopped by Officers Marcus and McKenny, assigned to the Ninth District, for failure to stop at a stop sign.[13] Trial Tr. 53:3–54:13, Jan. 19, 2006. Upon investigation at the scene, it was determined that Kareem was driving without a license and was in possession of a small bag of marijuana. Trial Tr. 59:2–16, Feb. 17, 2006. Kareem was issued a traffic citation and arrested for possession of marijuana. Trial Tr. 59:16–19, Feb. 17, 2006.

#### a. IAD 98–04

Mr. Glass testified at trial that Jamal Perry, the passenger in the car driven by Kareem the day of the January 1, 1998 incident, told him that he had overheard one of the officers on the scene of the arrest state to a superior officer that Kareem was the "kid that had the civil rights lawsuit," and then asked the superior officer for authority to strip-search Kareem, which authority was denied.[14] Trial Tr. 44:4–45:14, Jan. 18, 2006.

On January 3, 1998, after hearing the information from Jamal Perry, Mr. Glass filed a citizen's complaint, IAD 98–04, against Officers Marcus and McKenny. Trial Tr. 40:4–11, Jan. 18, 2006; Pls.' Ex. 20 at 480. Mr. Glass wrote:

> These two officers have expressed dislike for Kareem and myself because we have a civil action against several policemen here at the 9th district, for beating my son almost to death. They frequently harass and try to intimidate Kareem and myself and family members. On numerous occasions they have stopped Kareem on the street and searched him without cause, and have often made profane and demeaning comments about me and Kareem. I am here today because I am seeing an escalation in the abuse of authority being demonstrated by these officers. They are constantly riding in front of my house, and on my block watching our house and staring at our family and friends as they enter and exit our home.

Pls.' Ex. 20 at 481.

On January 17, 1998, Mr. Glass and Ms. Malloy went to IAD's offices to request that IAD, and not the Ninth District, investigate his complaint. The request was denied by IAD and the matter was referred to the Ninth District for investigation.

#### b. Mr. Glass's statements to Lieutenant Lampe and Sergeant Craighead

Under the usual procedures then in place, IAD assigned the complaint, IAD 98–04, to Captain Ditchkofsky at the Ninth District. In turn, Captain Ditchkofsky delegated the investigation to Lieutenant Lampe. Trial Tr. 48:1–9, Jan. 31, 2006. In turn, Lieutenant Lampe assigned Sergeant Craighead, also of the Ninth District, to interview Mr. Glass. Sergeant Craighead interviewed Mr. Glass concern-

---

**13.** At trial, plaintiffs argued that Officers Marcus and McKenny were regularly partnered for patrol. However, Officer Marcus testified that he and Officer McKenny usually were not partnered together because they worked varied shifts. On January 1, 1998, according to Officer Marcus, he and McKenny were not partnered together. Officer McKenny arrived on the scene of the car stop as back up for Officer Marcus, who had already initiated the stop. Trial Tr. 35:1–37:1, Feb. 17, 2006.

**14.** The statements of Jamal Perry and Kareem to Mr. Glass are hearsay and are not admissible as substantive evidence in the case. However, they are admissible to determine Mr. Glass's state of mind at the time he filed the citizen's complaint, IAD 98–04. As a factual matter, Kareem alleged he was strip-searched because he had to remove all but one layer of clothing and he had to remove his shoelaces.

ing the allegation in his complaint, IAD 98–04, at the Ninth District. Later, Lieutenant Lampe also interviewed Mr. Glass at his house. Following the home interview, Lieutenant Lampe typed a statement for Mr. Glass to sign. According to Lieutenant Lampe, the typed statement consolidated the information obtained during both the Craighead and Lampe interviews with Mr. Glass. Upon review of the statement, Mr. Glass refused to sign the statement claiming that it did not accurately reflect what he had told Sergeant Craighead and Lieutenant Lampe during both interviews.[15] Trial Tr. 55:6–11, Jan. 18, 2006.

On February 9, 1998, Mr. Glass again tried to arrange for IAD and not the Ninth District to investigate his complaint, IAD 98–04, and IAD again referred the matter to the Ninth District. Trial Tr. 75:4–25, Jan. 18, 2006.

On February 10, 1998, Mr. Glass and Ms. Malloy met with Lieutenant Lampe at the Ninth District. Again Mr. Glass refused to sign the statement prepared by Lieutenant Lampe. Trial Tr. 76:1–78:25, Jan. 18, 2006. At that point, Lieutenant Lampe submitted the Mr. Glass statement that he had prepared to his supervisor, Captain Ditchkofsky, without Mr. Glass's signature. Trial Tr. 99:1–4, Jan. 31, 2006. The investigation report submitted to IAD by Captain Ditchkofsky concluded that Mr. Glass's allegations that Officers Marcus and McKenny verbally abused Kareem or

that Kareem was strip-searched were not sustained. Pls.'s Ex. 20 at 479.

3. *February 10, 1998 arrest of Mr. Glass and Kareem*

On February 10, 1998, after meeting with Lieutenant Lampe, Mr. Glass proceeded to pick up Kareem at a friend's house. While driving home, their car was stopped by Ninth District Officers Vales and Rockeymore, who were in uniform in a patrol car. The stop occurred in front of Mr. Glass's house.

According to Officers Vales and Rockeymore, the car in which Mr. Glass and Kareem were driving matched the description of a vehicle and two African American males that had fled two nights before while being pursued by police Officer Robert Auman of the Sixth District (the district adjacent to the Ninth).[16] Officer Vales testified that he recalled the description of the black Acura and tag number because he had been on duty and had begun to attempt to intercept the vehicle two nights prior. After checking the tag number over the police radio, the tag number came back as belonging to a Fiat model vehicle, a different vehicle than the black Acura to which the tag was affixed. Trial Tr. 56:14–57:3, Feb. 13, 2006.

The testimony of Officers Vales and Rockeymore and of Mr. Glass and Ms. Malloy concerning what happened next during the car stop is in sharp conflict. According to Mr. Glass, Officers Vales and

---

**15.** At trial, Mr. Glass testified as to certain inconsistencies in the statement. For example, the statement identified the police station as the site of the interview instead of Mr. Glass's home, and also failed to identify Sergeant Craighead as one of the interviewers. Plaintiffs argued that these inconsistencies demonstrated an attempt to subvert a proper investigation of Mr. Glass's complaint. Lieutenant Lampe, however, explained that the inconsistencies were the result of clerical er-

rors in not changing the standard information at the top of the computer form into which he typed the statements.

**16.** Plaintiffs argue that Officer Auman could not say with certainty whether the occupants of the black Acura were two African American males because the car had dark tinted windows and the officer's only vantage point was through the car's rear window.

Rockeymore drew their weapons as they exited the patrol car and approached Mr. Glass and Kareem's vehicle. The officers reportedly yelled "stop, motherfuckers before we blow out your motherfucking brains."[17] Trial Tr. 32:16–18, Jan. 18, 2006. According to Mr. Glass, Officer Rockeymore approached him, grabbed him by his collar and put a gun to his head. Trial Tr. 34:10–19, Jan. 18, 2006. Officer Rockeymore, pulling on Mr. Glass's collar, used his knee to force Mr. Glass towards his car, asking "whose fucking car is this?" Trial Tr. 35:4, Jan. 18, 2006.

Also according to Mr. Glass, Officer Vales approached Kareem, also with a gun pointed at Kareem's head. Trial Tr. 35:9–11, Jan. 18, 2006. Meanwhile, other police personnel began to arrive on the scene as back-up and a crowd began to gather in front of the Glass house. Trial Tr. 36:13–15, Jan. 18, 2006. According to Mr. Glass, he tried to explain to the officers that he had the proper paperwork for the car, but to no avail. Trial Tr. 37:21–24, Jan. 18, 2006. Mr. Glass and Kareem were then handcuffed and placed in a police car.

Meanwhile, Ms. Malloy, who had just arrived at Mr. Glass's house prior to the incident, testified that she witnessed the incident from Mr. Glass's front porch.[18] Trial Tr. 129:16–20, Jan. 19, 2006. She testified that she attempted to intervene, asking the officers why they were arresting Mr. Glass and Kareem. According to Ms. Malloy, as she approached the scene, another unnamed officer drew his weapon, pointed it at her and said "motherfucker, step aside or I'll blow your motherfucking brains out." Trial Tr. 134:4–7, Jan. 19, 2006.[19] Ms. Malloy testified that, from inside the house, she saw Mr. Glass being handcuffed by Officer Rockeymore and heard Mr. Glass complain that the handcuffs were too tight.[20] Trial Tr. 139:7–140:6, Jan. 19, 2006. She also testified that she saw Mr. Glass and Kareem being

17. There is conflicting testimony concerning whether Mr. Glass and Kareem were still inside the car when the officers approached or whether Mr. Glass and Kareem had already exited the vehicle. Officer Vales testified that Mr. Glass and Kareem had already exited the vehicle when the officers approached the car with their weapons drawn. However, Officer Rockeymore testified at deposition that Mr. Glass and Kareem were still inside the car when the officers approached. Trial Tr. 126:7–12, Feb. 2, 2006. Mr. Glass testified that he and Kareem were "standing at the entry to [his] yard, right at the gate" of Mr. Glass's home. Trial Tr. 33:19–21, Jan. 18, 2006.

18. In addition to Ms. Malloy, plaintiffs presented two other eyewitnesses to the February 10, 1998 stop: Joseph Russell and Frederick Snead. Russell and Snead testified that on the night of February 10, 1998, they were coming from a bar when they heard the noise from the incident and witnessed the arrests of Kareem and Mr. Glass. Trial Tr. 36:19–37:11, Feb. 22, 2006; Trial Tr. 35:6–40:2, Feb. 28, 2006.

19. Ms. Malloy testified that she called her sister, Traffic Court Judge Bernice DeAngelis, for help. Judge DeAngelis testified that her sister related largely the same story. Although Ms. Malloy's words to Judge DeAngelis are inadmissible hearsay, the Court considered Ms. Malloy's words to be an excited utterance, which is an exception to the hearsay rule. Fed.R.Evid. 803(2).

20. Plaintiffs elicited testimony as to the customary procedure for placing handcuffs on a suspect. As a matter of course, officers usually "double-lock" the handcuffs, which prevents the handcuffs from tightening once they are placed on the suspect. An officer may also "single-lock" handcuffs, which allows the handcuffs to be tightened with a pull of the cuffs. Trial Tr. 146:6–148:12, Feb. 2, 2006. Plaintiffs argued that Officer Rockeymore single-locked the handcuffs on Mr. Glass and then yanked the handcuffs to tighten them and make Mr. Glass uncomfortable. Trial Tr. 58:21–59:10, Jan. 18, 2005.

placed in the police car, after which she observed the following:

> as they were pulling away, Officer [sic] Marcus and McKenny, they were high-fiving each other up in the air, saying hey, we got them niggers now. They want their civil rights. We'll give them their fucking civil rights. Lieutenant Lampe and a couple of other people down the 9th District are going to be real fucking happy.

Trial Tr. 138:15–21, Jan. 19, 2006.[21]

Officers Rockeymore and Vales tell a different story. According to Officer Rockeymore, Mr. Glass and Kareem initially ignored the officers' attempt to stop the vehicle. Officer Rockeymore testified that Mr. Glass got out of the car and walked toward his home "with a nonchalant attitude."[22] Trial Tr. 98:5–99:14, Feb. 2, 2006. As Officer Rockeymore exited the patrol car to approach the black Acura, he drew his weapon. Initially, the weapon was pointed at the ground, but when Officer Rockeymore got closer to the car, he pointed his weapon at the vehicle. Trial Tr. 133:12–15, Feb. 2, 2006. Officer Rockeymore denies ever placing his gun to Mr. Glass's head during the vehicle stop. Trial Tr. 152:7–9, Feb. 2, 2006. Officer Rockeymore does not remember seeing Ms. Malloy at the scene. Trial Tr. 153:20–154:10, Feb. 2, 2006.

Officer Vales remembers that he approached Kareem with his gun in the "low ready position," which is out of the holster but facing downward, and raised it to the "shooting position" at some point, which is aimed at the center mass with the officer's finger outside of the trigger guard. Trial Tr. 9:12–10:17, Feb. 13, 2006. Officer Vales did not recall ever pointing his gun at Kareem's head. Trial Tr. 16:5–13, Feb. 13, 2006. While he remembered seeing Ms. Malloy at the scene, he denied pointing a gun at her. Trial Tr. 33:20–34:25, Feb. 13, 2006.[23]

---

**21.** Officer Rockeymore testified that he remembered overhearing other Ninth District officers saying after the stop, but not during or immediately following it, that Lieutenant Lampe would be happy that they "got" Mr. Glass and Kareem. Trial Tr. 157:24–160:6, Feb. 2, 2006. Officer Rockeymore heard words to this effect while inside the Ninth District police station. According to Officer Rockeymore, he heard officers "who sounded white" stating that Lieutenant Lampe would be happy they "got" the Glasses. Trial Tr. 157:24–160:6, Feb. 2, 2006. In addition, Joseph Russell and Frederick Snead also testified that they observed officers "high-fiving" at the scene of the February 19, 1998 stop. Trial Tr. 22:14–16, Feb. 22, 2006 (testimony of Mr. Russell); Trial Tr. 39:20–24, Feb. 28, 2006 (testimony of Mr. Snead).

There was no clear testimony that placed Lieutenant Lampe at the scene of the February 10, 1998 incident. Plaintiffs point to the police radio transmissions from that night that involve Lieutenant Lampe's call signal "9 Tom 7" or "9 Command" as evidence that he was present during the stop. Pls.' Ex. 43A. That conclusion, however, conflicts with the alleged statement by officers on the scene that "Lieutenant Lampe would be happy [to find out the Glasses' had been arrested]," which presumes that Lieutenant Lampe was not at the scene and would have to be told about the stop at another time.

**22.** Again, Officer Rockeymore's testimony that he observed Mr. Glass walking "nonchalantly" conflicts with his deposition testimony that Mr. Glass and Kareem were still inside the vehicle as the officers approached.

**23.** At some point during the vehicle stop or shortly thereafter, a tape of radio dispatch communications reflects that Officer Marcus asked the dispatcher to locate Lieutenant Lampe. Trial Tr. 26:4–13, Feb. 17, 2006. Officer Marcus could not recall at trial why he wanted to speak with Lieutenant Lampe or whether he actually did so on the night of February 10, 1998. Trial Tr. 31:21–23, 33:16–22, Feb. 17, 2006. Neither Officers Marcus or McKenny, who were briefly on the scene but did not participate in the actual stop and arrest, saw Ms. Malloy at the scene. Trial Tr. 13:6–8, 69:22–24, Feb. 17, 2006.

While still on the scene of the vehicle stop, police radio confirmed the following:

On the VIN, a '90 Acura [the car driven by Kareem], never validated, no tag assigned, owner is listed as one Reuben Glass. Resides 822, North 19th Street, Philadelphia, Pennsylvania, the zip is 19130, no tag assigned and showing no warrants on it.

Pls.' Ex. 43A at 7:15–19 (transcript of police radio communications for the stop).[24] Thereafter, Mr. Glass and Kareem were transported to the Ninth District in a police wagon.[25] The police radio transmission stated the Mr. Glass and Kareem were "going in for investigation." Pls.' Ex. 43A at 6:1–2.

While Mr. Glass and Kareem were still at the Ninth District, Officer Auman, the Sixth District officer who had pursued the black Acura, arrived to identify the vehicle. At that time, Officer Auman stated that the car driven by Kareem that night "appeared" to be the same black Acura he had pursued two nights before.[26] Trial Tr. 35:14–25, Feb. 14, 2006. After a few hours of custody, Mr. Glass and Kareem were released and not criminally charged. Kareem was issued four traffic citations: (1) unlawful plate display because the tag was registered to a Fiat; (2) unlicensed driver because Kareem did not have a driver's license; (3) lack of required financial responsibility; and (4) unregistered vehicle. Pls.' Ex. 38 at 1–4.[27]

a. *February 12, 1998 meeting*

At the request of Mr. Glass, Councilman Darrell Clarke, who was then City Council President John Street's chief of staff, asked Inspector Tiano to arrange a meeting to address Mr. Glass's complaints. Trial Tr. 138:1–12, Feb. 21, 2006. In turn, Inspector Tiano held a meeting on February 12, 1998 at the Ninth District police station. Trial Tr. 84:18–23, Jan. 18, 2006. Present at the February 12, 1998 meeting were Mr. Glass, Ms. Malloy, Councilman Darrell Clarke, Frederick Snead, Inspector Tiano (commanding officer of the Ninth District in 1998) and Captain Ditchkofsky (captain of the Ninth District in 1998). Trial Tr. 85:1–4, Jan. 18, 2006.[28]

24. At trial, the Court listened to the tape of the police radio transmissions during the February 10, 1998 stop. Although both parties used the transcript of the radio transmissions, provided as Plaintiffs' Exhibit 43A, defendants noted on the record that they did not stipulate to the accuracy of the transcript. The Court will refer to the transcript of the radio communications that were commensurate with the portions of the tape listened to during trial.

25. According to both Officers Rockeymore and Vales, neither Mr. Glass nor Kareem was under arrest, but they also were not free to leave. Trial Tr. 20:12–15. Rather, Mr. Glass and Kareem were being detained for an "investigatory detention," where they were not being charged with a crime but were not free to leave. Trial Tr. 20:20–21:3, Feb. 13, 2006. The police directives set forth a policy for identifying suspects who were stopped and briefly detained for investigation. Directive 58.II.B. stated that officers are to bring the witness to the location of the suspect for identification purposes. Pls.' Ex. 52A. The directive does not provide for the process of an "investigatory detention."

26. Plaintiffs point to a prior IAD investigation of Officer Auman, wherein he stated that he attempted to identify Mr. Glass and Kareem as occupants of the black Acura he pursued when they were at the Ninth District, but was unable to do so.

27. Plaintiffs' Exhibit 38 is not numbered, therefore the Court numbered the pages consecutively to provide a more accurate citation.

28. Recall that during the February 10, 1998 incident, Ms. Malloy called her sister, Judge Bernice DeAngelis, then administrative Judge of the Philadelphia Traffic Court, to report the incident and to seek her intervention. Trial Tr. 7:4–8, Jan. 20, 2006. According to Judge DeAngelis, after hearing from Ms. Malloy on

During the meeting, Mr. Glass informed Inspector Tiano and Captain Ditchkofsky about the pending lawsuit (*Glass I*) and identified the named defendants in that case. Trial Tr. 86:6–17, Jan. 18, 2006. Mr. Glass also described his concerns with Lieutenant Lampe and Sergeant Craighead regarding his written statement prepared by Lieutenant Lampe for the investigation of Mr. Glass's citizen's complaint, IAD 98–04. Trial Tr. 86:22–87:1, Jan. 18, 2006. According to Mr. Glass, Captain Ditchkofsky "tore it [the typed statement prepared by Lieutenant Lampe] up and threw it in the trash and said there, that's done with" and then offered to take Mr. Glass's statement himself. Trial Tr. 91:14–15, 91:25–91:1, Jan. 18, 2006.

Sometime after the meeting, Captain Ditchkofsky reportedly helped Mr. Glass retrieve the black Acura from police custody following the February 12, 1998 meeting. Trial Tr. 149:1–3, Jan. 31, 2006. Also, Captain Ditchkofsky reiterated his willingness to take Mr. Glass's statement concerning the January 1, 1998 incident directly, and with Mr. Glass's lawyer present, in an effort to remedy any perceived problems Mr. Glass had with the statements taken by Lieutenant Lampe and Sergeant Craighead. Trial Tr. 149:4–8, Jan. 31, 2006. Mr. Glass never went back to have Captain Ditchkofsky take a new statement. Trial Tr. 148:21–22, Jan. 31, 2006.

On March 10, 1998, the trial in *Glass I* was rescheduled to begin on May 1, 1998. Mar. 10, 1998 Order, 96–2752 (doc. no. 48).

### b. *IAD 98–132*

On April 2, 1998, Mr. Glass filed a complaint—IAD 98–132—against Officer Rockeymore for physical abuse during the February 10, 1998 incident in front of the Glass house. The complaint also described allegations of harassment by Officers Marcus and McKenny, including Mr. Glass's dissatisfaction with the decision by IAD to allow the Ninth District to investigate his earlier complaint. Pls.' Ex. 21 at 149. Lieutenant Gary Blackwell of IAD was assigned to investigate IAD 98–132. Trial Tr. 9:13–10:5, Feb. 15, 2006, vol. 2. Lieutenant Blackwell investigated only the allegations against Rockeymore; and he did not address any other allegations in the complaint. Trial Tr. 19:10–13, Feb. 15, 2006, vol. 2.

Lieutenant Blackwell's first action was to try to interview Mr. Glass concerning the allegations in his complaint. To that end, Lieutenant Blackwell telephoned Mr. Glass and sent letters to him via certified and regular mail requesting a statement and telephoned Mr. Glass. Mr. Glass declined to make an appointment and failed to call back. Lieutenant Blackwell then visited the Glass home where Mr. Glass again refused to give a statement and reported that his attorney would call back Lieutenant Blackwell. Pls.' Ex. 21 at 144–45. Accordingly, the interview with Mr. Glass was never scheduled. Lieutenant Blackwell then interviewed Gail Clarke, a/k/a "Ms. Cookie," reportedly an eyewitness identified by Mr. Glass, who said she

the phone, she immediately called Inspector Tiano, with whom she had developed a working relationship during the mid- to late-1980s in her capacity as a ward leader. Trial Tr. 7:16–8:4, Jan. 20, 2006. Judge DeAngelis testified that she told Inspector Tiano that Ms. Malloy had told her that the officers were arresting Mr. Glass and Kareem, the officers had drawn their weapons, the officers placed their weapons to the heads of Mr. Glass and Kareem and one of the officers had pointed his weapon at Ms. Malloy. Trial Tr. 10:22–11:12, Jan. 20, 2006. According to Judge DeAngelis, Inspector Tiano reported to her information about the fleeing black Acura and the false tags, in addition to a suspicion that Mr. Glass was a drug dealer. Trial Tr. 12:16–23, Jan. 20, 2006.

only saw Mr. Glass being placed in a police car. Pls.'s Ex. 21 at 145. None of Mr. Glass's other witnesses responded to Lieutenant Blackwell's requests for interviews. Lieutenant Blackwell also interviewed Police Officers Brodheim, Clark, Balzer, Auman, Marcus and Rockeymore.[29] On July 2, 1998, Lieutenant Blackwell requested to close the investigation for lack of cooperation by the complainant, Mr. Glass. Pls.' Ex. 21 at 145. The request was approved and the investigation was closed without findings. Pls.' Ex. 21 at 145.

### 4. The Glass I trial begins and Kareem is arrested

On April 27, 1998, the trial in *Glass I* was again rescheduled to begin on May 4, 1998. Apr. 27, 1998 Order, 96–2752 (doc. no. 52). On the first day of trial, Tamara Floyd, Joseph Russell and George Doggett, witnesses for Kareem, were at the courthouse willing to testify. Trial Tr. 125:10–12, Jan. 18, 2006. Two other witnesses listed did not appear.[30] Mr. Glass waited in the hallway outside of the courtroom with the witnesses while the trial was held. Trial Tr. 131:20–22, Jan. 18, 2006. Early in the trial, the Glasses called their expert witness, Dr. Orrin Davinsky, to the stand. After his testimony was completed, according to Mr. Glass,[31] the officers exiting the courtroom looked "shook up" and he assumed the expert must have given "some good testimony." Trial Tr. 132:1,

11–12, Jan. 18, 2006. The next day, the trial would take an unexpected turn.

### a. The Derek Bohannon case and word of Kareem's impending arrest during the trial of Glass I

#### i. The Bohannon complaint

In April of 1998, a few days before the trial in *Glass I* began, Derek Bohannon[32] accused Kareem of assault and filed a complaint with the police. Derek Bohannon was a childhood friend of Kareem's. Detective Sean Brennan of Central Detective Division was assigned to the investigation of Bohannon's complaint.

According to the Investigation Report prepared by Detective Brennan, Bohannon alleged that on April 10, 1998 while riding in a green Oldsmobile with his friends, Bohannon saw Kareem at the corner of 16th and Brown Streets. Pls.' Ex. 5 at 68. Allegedly, Kareem pulled a gun from his waist, pointed it at Bohannon and shot twice. Pls.' Ex. 5 at 68. Bohannon immediately drove away and was not injured. Detective Brennan further stated in the Investigation Report that the shooting was related to an earlier fight between Bohannon and Kareem on March 13, 1998, where Kareem allegedly stabbed Bohannon six times. Pl.'s Ex. 5 at 68.

Detective Elizabeth Dotchel was assigned to the investigation of the March 13, 1998 stabbing of Derek Bohannon. According to Dotchel's Investigation Report,

---

**29.** Although Officer Vales was partnered with Rockeymore on February 10, 1998, he was not interviewed and Lieutenant Blackwell offered no explanation for his failure to do so. Trial Tr. 26:10–24, Feb. 15, 2006, vol. 2. Given that the case was closed for lack of cooperation by the complainant and his witnesses, the failure to interview Officer Vales is of no consequence.

**30.** Allegedly there were two other witnesses, Kenny Jones and Jamal Perry, neither of

whom appeared at the courthouse ready to testify on the first day of trial in *Glass I*. Trial Tr. 103:2–5, Jan. 18, 2006.

**31.** Mr. Glass was to be a trial witness and was sequestered and not in the courtroom while Dr. Davinsky testified.

**32.** The parties stipulated to the fact that Derek Bohannon was unavailable to be a witness at trial because he is deceased and was never deposed. Trial Tr. 122:15–19, Feb. 2, 2006.

Bohannon "was at 1500 Girard and a Hispanic male came up to him and stabbed him five times." Pls.' Ex. 5 at 63. Detective Dotchel testified that Kareem was never implicated during her investigation of the stabbing of Derek Bohannon. Trial Tr. 116:6–8, 118:10–13, Feb. 2, 2006. Moreover, Detective Dotchel never interviewed Derek Bohannon about the March 13, 1998 stabbing or had any contact with Bohannon. Trial Tr. 122:4–8, Feb. 2, 2006.

After being assigned the Bohannon complaint against Kareem, Detective Brennan testified that he interviewed Detective Dotchel on May 7, 1998 at 11:00 a.m. Detective Brennan testified that Detective Dotchel told him that Kareem was the defendant in the stabbing case. Pls.' Ex. 5 at 58. Although Detective Dotchel recalled that she had a telephone conversation with Detective Brennan that day, she denied that she was ever interviewed by Detective Brennan concerning Kareem during that call. Trial Tr. 113:19–114:2, Feb. 2, 2006. At trial, Detective Dotchel testified that she thought that, during the telephone conversation, Detective Brennan was referring to a separate complaint from the Bohannon stabbing that she was investigating. Trial Tr. 114:14–23, Feb. 2, 2006. She requested that Detective Brennan send Bohannon to her office because she needed to conduct an interview regarding the stabbing. Trial Tr. 114:2–7, Feb. 2, 2006. Bohannon never went to Detective Dotchel's office and Detective Dotchel never heard anything further from Detective Brennan. Trial Tr. 114:8–12, Feb. 2, 2006.

### ii. The arrest warrant

Detective Brennan interviewed Derek Bohannon regarding the alleged shooting assault by Kareem on April 10, 1998. Trial Tr. 100:6–8, Feb. 3, 2006. Sometime after that interview, Detective Brennan visited the Glass home in an attempt to interview Kareem. Trial. Tr. 93:23–94:9, Jan. 18, 2006. During the visit, Detective Brennan informed Mr. Glass that he did not want to arrest Kareem, but rather he only wanted to ask Kareem some questions. Mr. Glass offered to bring Kareem to the Ninth District for an interview. Trial Tr. 95:5–8, Jan. 18, 2006. According to Mr. Glass, Kareem called Detective Brennan several times, but never spoke to him. Trial Tr. 95:9–16, Jan. 18, 2006.

About two and a half weeks later, on April 26, 1998, Detective Brennan submitted via facsimile an affidavit of probable cause for an arrest warrant for Kareem in the Bohannon shooting incident to the district attorney's office for approval. Trial Tr. 108:6–109:14, Feb. 3, 2006; Pls.' Ex. 5 at 70. On that date, Assistant District Attorney ("ADA") Hardwell approved the affidavit of probable cause for arrest. Pls.' Ex. 5 at 70. This is where things stood as the trial in federal court in *Glass I* began on May 4, 1998.

On May 6, 1998, during the second day of trial, an unidentified male officer telephoned Detective Brennan inside Central Detectives "and asked if I [Detective Brennan] had a warrant for Kareem Glass." Trial Tr. 89:13–91:8, Feb. 3, 2006. Detective Brennan responded that he did not have a warrant, but he did have an affidavit approved by the ADA. Trial Tr. 91:10, Feb. 3, 2006. "His next information was that if I [Detective Brennan] wanted to arrest him [Kareem], he [Kareem] would be in Federal court the next day at nine a.m." Trial Tr. 91:18–19, Feb. 3, 2006. According to Detective Brennan, the unidentified officer did not indicate why he was conveying this information to him, nor did Detective Brennan inquire as to the caller's motive, identity or reason for the call. Trial Tr. 92:19–93:7, Feb. 3, 2006. At deposition, however, Detective Brennan testified that he had not been advised that

Kareem was in federal court on trial. Trial Tr. 94:4–13, Feb. 3, 2006. At trial, Detective Brennan was not able to reconcile his deposition testimony and his testimony at trial on this point. Trial Tr. 11–19, Feb. 3, 2006.

Late in the afternoon of May 6, 1998, at sidebar, defense counsel Shelley Smith informed the Court that she had learned of an outstanding arrest warrant for Kareem for aggravated assault. *Glass I*, Trial Tr. 209:6–17, May 6, 1998. Ms. Smith told the Court that, as she spoke, a detective was en route to the courthouse to arrest Kareem.[33] *Glass I*, Trial Tr. 209:13–16, May 6, 1998. The Court then dismissed the jury and conferred with the parties off the record. *Glass I*, Trial Tr. 210:7–212:17, May 6, 1998.[34]

That same evening, May 6, 1998, Detective Brennan appeared before Bail Commissioner Ivan Hill at 9:40 p.m. to affirm the information in the affidavit of probable cause. Trial Tr. 113:10–22, Feb. 3, 2006.

According to Mr. Glass, the news that a detective was on his way to arrest Kareem at the courthouse soon spread to the witnesses waiting to testify. Also according

to Mr. Glass, the witnesses left the courthouse immediately and became unavailable.[35] Trial Tr. 132:16–18, Jan. 18, 2006. Thereafter, plaintiffs did not subpoena the witnesses or take any other steps to secure their appearance in Court. Trial Tr. 132:21–133:6, Jan. 18, 2006.

The next morning, on May 7, 1998, Kareem surrendered himself to Central Detectives Division, which is located inside the Ninth District headquarters. *Glass I*, Trial Tr. 6:18–24, May 7, 1998.

b. *Settlement and release of Glass I*

On May 8, 1998, the parties informed the Court of an agreement to settle the case for a sum of $325,000 in exchange for a release. *Glass I*, Trial Tr. 5:15–6:9, May 8, 1998. The Court dismissed the case with prejudice pursuant to Local Rule 41.1(b). May 12, 1998 Order, 96–2752 (doc. no. 61). Within a month of the close of trial, on May 29, 1998, defendants presented Mr. Glass and Kareem with a release to be executed as part of the settlement. Trial Tr. 3:11–24, Jan. 19, 2006. However, only Kareem actually signed the release; Mr. Glass did not.[36]

---

**33.** Ms. Smith's exact words to the Court were:

we learned that there's an outstanding warrant for the arrest of Mr.—of Kareem Glass for aggravated assault on this particular witness. And in the course of trying to get this paperwork, the detective, of course, became aware that this case is now on trial, and that Mr. Glass is—I mean he's on his way here, and I think they're going to arrest him, so I wanted to let the Court know—

*Glass I*, Trial Tr. 209:10–17, May 6, 1998.

**34.** Trial in *Glass I* continued on May 7, 1998, the day after Ms. Smith informed the Court of Kareem's impending arrest and the day before the parties informed the Court that they had reached a settlement. Officers Addison, Williams and Muhammad, who were allegedly at the July 1995 incident, testified at trial on May 7, 1998. *Glass I*, Trial Tr. 3–101, May 7, 1998. Settlement discussions took

place during the lunch recess on May 7, 1998. *Glass I*, Trial Tr. 101:11–105:22, May 7, 1998. On the morning of May 8, 1998, the parties informed the Court they had reached a settlement.

**35.** Joseph Russell, one of plaintiffs' witnesses from *Glass I*, testified in the instant action, *Glass II*, that he was afraid to testify after learning that Kareem was going to be arrested during trial. Trial Tr. 25:4–26:7, Feb. 22, 2006.

**36.** Although Kareem was a minor at the time the lawsuit was filed, he attained the age of majority before the trial of *Glass I*. However, Mr. Glass was still advising Kareem, Mr. Glass participated in the settlement discussions, and Mr. Glass was present when Kareem signed the release. *Glass I*, Trial Tr. 4:23–5:10, May 8, 1998.

### 5. *August 31, 1998 arrest of Kareem*

On August 31, 1998, Kareem was arrested by Ninth District Officer Campbell while driving a car registered to Ms. Malloy. Trial Tr. 147:12–21, Jan. 18, 2006. Officer Campbell's incident report states that the car, a green Honda, was observed traveling at a "high rate of speed NB [northbound] on 20th St. weaving in and out of traffic, with no regard for ped[estrians] or other veh[icles], disregarding traffic signals." Pls.' Ex. 39. Officer Campbell testified that "the car was being operated by one Kareem Glass, he couldn't identify her [Ms. Malloy] as being the owner of a green Honda. And Kareem was brought into the 9th District under my orders for investigation of possibly it being a stolen Honda prior to it being reported." Trial Tr. 25:9–13, Feb. 23, 2006.

Mr. Glass and Ms. Malloy went to the Ninth District police station to retrieve the car driven by Kareem. Trial Tr. 148:7–11, Jan. 18, 2006. While at the Ninth District, Ms. Malloy informed Officer Campbell that Kareem had permission to drive her car. Trial Tr. 148:17–149:4, Jan. 18, 2006. Officer Campbell issued Ms. Malloy a traffic citation for allowing an unlicensed driver to operate her car. Trial Tr. 26:4–12, Feb. 23, 2006. Kareem was later released without being charged.[37] Trial Tr. 149:6–9, Jan. 18, 2006.

### 6. *September 16, 1998 conflict with Officer McKenny and IAD 98–369*

On September 16, 1998, Mr. Glass and Kareem attended a preliminary hearing on the Bohannon assault case involving the alleged shooting. Trial Tr. 149:12–150:2, Jan. 18, 2006. The *Bohannon* case was dismissed that day.[38] According to Mr. Glass, while driving home from the hearing, Officer McKenny followed him and Kareem. Trial Tr. 150:7–10, Jan. 18, 2006. According to Mr. Glass, as he approached the driveway to his residence, his daughter Inez Glass flagged him down to speak with him. However, he could not pull into the driveway because it was blocked by construction materials, so he double-parked the car to speak with Inez Glass. Trial Tr. 151:10–15, Jan. 18, 2006. Officer McKenny began honking his horn and appeared to be writing a ticket. Trial Tr. 152:8–12, Jan. 18, 2006. Further, according to Mr. Glass, Officer McKenny honked his horn and drove past his car and told Kareem, who was seated in the front seat next to Mr. Glass: "I'm going to fuck you up." [39] Trial Tr. 154:9–11, Jan. 18, 2006.

Officer McKenny's version of the incident is different. He testified that he noticed the double-parked vehicle and used his air horn to indicate to the driver to move his vehicle. Trial Tr. 97:13–17, Feb. 17, 2006. Mr. Glass then made a hand gesture toward Officer McKenny and said "Go the F[uck] around." Trial Tr. 97:17–

---

**37.** Mr. Glass and Ms. Malloy testified that they believed Officer Campbell was trying to have Ms. Malloy state that Kareem had stolen the car. The testimony is not credible in that it would be highly unlikely that Ms. Malloy would have been willing—and the officer would have asked her, in front of Mr. Glass— to verify the police officer's actions against Kareem given her relationship to the Glass family and as a personal friend of Mr. Glass.

**38.** It is unclear from the record why the *Bohannon* case was dismissed.

**39.** According to Mr. Glass, another police car, driven by a female officer, pulled alongside Officer McKenny's police car facing the opposite direction. Trial Tr. 152:18–19, Jan. 18, 2006. Mr. Glass then retrieved his camera from inside his house and took a photograph of both police cars, after which the officers drove away. Trial Tr. 152:19–21, Jan. 18, 2006; Pls.' Ex. 640–R (photographs taken by Mr. Glass).

18, Feb. 17, 2006. Traffic had begun to pile up and Officer McKenny again used his air horn to signal Mr. Glass to move his car and, according to Officer McKenny, Mr. Glass again disregarded the officer. At that point, Officer McKenny pulled over to issue Mr. Glass a ticket, but realized he did not have any tickets. Trial Tr. 97:18–21, Feb. 17, 2006. Officer McKenny testified that he radioed for a patrol car with an officer with parking tickets to meet him at the scene. In a few minutes, a patrol car driven by Officer Jemma Muhammad arrived on the scene. In the meantime, Mr. Glass had retrieved his camera and was taking pictures of the police cars at the scene. Trial Tr. 97:21–98:3, Feb. 17, 2006. Officer McKenny then left the scene without issuing a ticket. Trial Tr. 98:1–3, Feb. 17, 2006.

Following the September 16, 1998 incident, Mr. Glass filed a complaint, IAD 98–369. Pls.' Ex. 22. The complaint included not only the conduct of September 16, 1998, but also Mr. Glass's opinion that Officer McKenny was angry that the Bohannon case had been dismissed by the court. Captain Ditchkofsky assigned the complaint to Lieutenant Robert Nudd for investigation of the September 16, 1998 incident only, not of Mr. Glass's general claim of harassment. Trial Tr. 118:20–122:8, Mar. 3, 2006.

Lieutenant Nudd attempted to contact Mr. Glass for an interview by telephone, registered mail and home visits. Trial Tr. 98:12–16, Mar. 3, 2006. Although Lieutenant Nudd spoke with Mr. Glass and scheduled an appointment, Mr. Glass did not appear for the interview. Trial Tr. 98:17–21, Mar. 3, 2006. Moreover, none of Mr. Glass's witnesses recalled the occurrence, with the exception of Roy Crockett, who remembered seeing a black male taking pictures of a police car. Pls.' Ex. 22 at 2–3. Lieutenant Nudd testified that he also canvassed the neighborhood for witnesses and spoke with some members of the community who "were able to provide ... some insights." Trial Tr. 99:2–6, Mar. 3, 2006. Ultimately, however, Lieutenant Nudd "concluded that the allegation against Officer McKenny by Mr. Glass was frivolous and that the evidence did not support the allegation[, and] exonerated him of verbal abuse and harassment in the case." Trial Tr. 101:1–3, 7–8, Mar. 3, 2006. Lieutenant Nudd also noted that Mr. Glass had filed two prior complaints naming Officer McKenny, but had failed to cooperate in the Ninth District's investigation of both complaints. Pls.'s Ex. 22 at 3.

### 7. *The FTA bench warrant in the Bohannon case*

After the parties settled *Glass I*, Kareem was still the subject of an ongoing investigation regarding the complaint made by Derek Bohannon that Kareem fired two gunshots at him, for which Kareem had surrendered in the midst of the *Glass I* trial. Trial Tr. 5:2–19, Jan. 19, 2006. Kareem and/or Mr. Glass filed several IAD complaints following a series of arrests pursuant to an allegedly invalid failure to appear ("FTA") bench warrant related to one of several preliminary hearings associated with the assault charge.

On several occasions between November 22, 1998 and January 13, 1999, Kareem was arrested pursuant to a bench warrant. Plaintiffs claim the warrant was "phony," meaning it was never validly entered into the police computer system and it was introduced into the computer system for the purpose of creating a pretext to arrest Kareem.[40]

**40.** A copy of the warrant has never been located or produced by the City of Philadel-phia. Leonard Armstrong, the Deputy Director for Active Criminal Records in the

### a. *The warrant system*

At issue are bench warrants, which originate in the clerk of court's office, not with the police department. Trial Tr. 127:24–128:5, Feb. 22, 2006. To understand the nature of this claim, the Court will describe the operation of the warrant system employed by the Philadelphia Police Department at the relevant time. In 1998, warrant entry and removal from the court system, numbering in the thousands, occurred daily. Trial Tr. 129:5–6, Feb. 22, 2006. Every day, the court system created two tapes. One tape was an add tape, which added new bench warrants to the system. The other tape was a delete tape, which canceled warrants from the system. The Mayor's Office of Information Systems, where the Philadelphia Crime Information Center's ("PCIC") mainframe was located, would "run" the tapes Monday through Friday. Trial Tr. 128:16–129:6, Feb. 22, 2006. The entry of a warrant into the system generated a "wanted message."

Philadelphia police officers retrieved information pertaining to wanted persons, stolen property or missing persons from the PCIC, or its national counterpart, the National Crime Information Center ("NCIC"), via computer. Trial Tr. 117:14–118:3, Feb. 22, 2006. One of the purposes of the PCIC system was to allow an officer on the street in the course of a stop to determine if there were any outstanding warrants for the person in question. The Data Processing Unit ("DPU") was a division of the PCIC housed at police head-

quarters, on 8th and Race Streets. Trial Tr. 118:18–21, Feb. 22, 2006. Members of the DPU inputted information into the computer system, a function that could only be performed while inside room 211 of police headquarters. Trial Tr. 119:17–19, Feb. 22, 2006.

In addition, so-called "sworn" members of the Police Department, i.e. detectives, narcotics or special victims officers, also had the authority to request that the DPU input a "wanted message" into the system. Trial Tr. 121:4–122:15, Feb. 22, 2006. To do so, a detective would send a teletype message to room 211 and a PCIC operator would enter that "wanted message" into the computer system with the understanding that the "wanted message" was supported by an actual arrest warrant. Trial Tr. 125:13–126:17, Feb. 22, 2006.

There were certain checks in place to ensure "wanted messages" entered into the police computer system by court tapes or by "sworn" officers were valid. Bench warrants created by the court system were validated by the court tapes, which were run Monday through Friday. The PCIC relied on these tapes to ensure the accuracy of the bench warrant files. A PCIC operator would not delete a "wanted message" related to a bench warrant from the system other than through the daily delete tapes or pursuant to a request made by the courts. Trial Tr. 136:11–23, Feb. 22, 2006. In addition to the daily tapes, the PCIC conducted a bi-annual "purge" of the bench warrant database. All bench war-

---

Court of Common Pleas, Philadelphia County, testified at trial.

Mr. Armstrong testified that a copy of the bench warrant should have been in the court file and there should have been an electronic entry in the court database. Trial Tr. 16:4–25, Jan. 31, 2006. He reviewed the court file and the electronic database and found no bench warrant or electronic entry showing that a bench warrant was entered against

Kareem. The records did indicate, however, that an FTA bench warrant was entered for Derrek Bohannon. Trial Tr. 13:25–14:10, Jan. 31, 2006.

The actual court file was checked out on March 29, 2001 by Assistant City Solicitor Edward Chew and was not returned. Trial Tr. 7:23–8:7, Jan. 31, 2006. The file was not located as of the close of trial.

rants would be deleted from the database and then reloaded from a new tape supplied by the court system. Any bench warrant that was no longer valid after the purge would not be on the tape supplied by the courts and would not be reentered into the PCIC. Trial Tr. 28:6–12, Mar. 2, 2006.

The validation process for "wanted messages" generated by detectives and other "sworn" officers occurred monthly. Trial Tr. 126:20–24, Feb. 22, 2006. The PCIC printed out a list of the wanted files generated by each division or investigatory unit, such as the Central Detectives Division or the Narcotics Unit. The list was then sent to the commanding officer of each division or investigatory unit, who would pull the actual (arrest) warrants and match them with the (arrest) warrant entries in the PCIC records. The commanding officers then sent the list, with any corrections or remarks, back to PCIC. Trial Tr. 127:1–9, Feb. 22, 2006. PCIC relied upon the audit conducted by each investigatory unit, and did not independently verify the information that supported the "wanted messages" generated by each investigatory unit. Trial Tr. 127, 10–13, Feb. 22, 2006.

In addition, PCIC had a "quality control staff," which checked the operators' work for the last 24 hours. Each morning, the quality control staff "scour[ed]" the work from the previous day, "looking for any mistakes or any inconsistencies or any violations of our own [PCIC's] procedures or protocols within the unit." Trial Tr. 40:7–11, Mar. 2, 2006.[41] Only PCIC employees were able and had the authority to actually delete warrants from the system.

### b. November 22, 1998 arrest and IAD 98–502

On November 22, 1998, Kareem was arrested pursuant to the FTA bench warrant. Pls.' Ex. 23 at 454. The arrest followed a traffic stop of a vehicle in which Kareem was a passenger. According to Ninth District Officer James Barrett, he performed the vehicle stop at 16th Street and Ridge Avenue because the vehicle had expired temporary registration tags. Pls.' Ex. 23 at 454–55. Officer Frederick Simpkins, according to the IAD investigation report, stated that he heard the traffic stop over the police radio and arrived on the scene as back up to assist Officer Barrett, who had been patrolling alone. Pls.' Ex. 23 at 455.

According to Officer Barrett, the driver of the vehicle could not produce a driver's license or any vehicle registration documents. Pls.' Ex. 23 at 455. Therefore, he proceeded to ask all occupants of the vehicle for their names. Officer Barrett than ran the names through the computer in his police car and discovered that Kareem was wanted on a bench warrant. Pls.' Ex. 23 at 455. Officer Barrett released the other occupants of the vehicle and took Kareem to the Ninth District. Once at the Ninth District, Officer Barrett telephoned the warrant unit and was instructed to give Kareem a new court date and to release him from custody. Pls.' Ex. 23 at 455. Officer Barrett issued Kareem a "Notice of Appearance" for 8:00 a.m. on January 13, 1999 at 34 S. 11th Street and released him. Pls.' Ex. 23 at 472.

---

**41.** Lieutenant Lapetina testified that, for example, a red flag for the quality control staff would include a request from a detective pertaining to a bench warrant because bench warrants are issued by the courts, not by "sworn" officers. Trial Tr. 39:25–40:5, Mar. 2, 2006. Moreover, Lieutenant Lapetina testified that it is technically possible for an individual with access to PCIC to manually enter information and create an entry that would appear to be identical to an entry made by the court system tapes. Trial Tr. 37:23–38:15, Mar. 2, 2006. The sheer possibility of such an entry was not connected to or supported by any other facts presented at trial.

Kareem filed a complaint, IAD 98–502, on November 23, 1998, the day after the traffic stop, against Officer Simpkins and a white male officer whose description matches that of Officer Barrett. Pls.' Ex. 23. Kareem complained that the bench warrant was not valid, since he had appeared for every scheduled hearing in the Bohannon matter. Kareem also complained that the "Notice of Appearance" he received from Officer Barrett directly conflicted with another notice previously issued.[42]

IAD assigned Lieutenant Blackwell to investigate the complaint, IAD 98–502. During that investigation, Lieutenant Blackwell interviewed Kareem, Officer Barrett and Officer Simpkins. Pls.' Ex. 23 at 459–64. He also reviewed the notices to appear (on the same date and time but at different locations), of which Kareem complained, and he retrieved a record of the computer inquiry performed by Officer Barrett during the traffic stop. Pls.' Ex. 23 at 467–472. Lieutenant Blackwell concluded that Officer Barrett "conducted a proper vehicle investigation" and Officer Simpkins's "only role was as back up," therefore exonerating both officers of any wrongdoing. Pls.' Ex. 23 at 456.

c. *December 22, 1998 arrest and IAD 98–527*

On December 22, 1998, Kareem again was arrested for the FTA bench warrant during a vehicle stop. Pls.' Ex. 24. At approximately 12:30 a.m., according to her IAD interview, Ninth District Officer Doreen Bright observed a vehicle at 16th and Poplar Streets with inoperative taillights and an expired registration tag.[43] Pls.' Ex. 24 at 265. According to the IAD interview, she stopped the vehicle and asked the driver for his license, registration and proof of insurance. Pls.' Ex. 24 at 265. When Kareem could not produce that information, Officer Bright took his name and birth date and ran that information through the computer in her patrol car. The computer displayed that Kareem had an FTA bench warrant. Pls.' Ex. 24 at 265. Officer Bright then proceeded to arrest Kareem and bring him to the Ninth District pending the "Identification Process."[44] Kareem was fingerprinted at approximately 3:09 a.m., and the Offender Processing Unit confirmed his identity by 4:01 a.m. Pls.' Ex. 24 at 253. Next, the Warrant Unit was contacted and it was determined that the bench warrant was invalid because the Bohannan case had been "disposed of" on October 4, 1998. Pls.' Ex. 24 at 263. Kareem was released at approximately 4:30 a.m. on December 22, 1998. Pls.' Ex. 24 at 254.

As a result of this incident, Kareem filed a complaint, IAD 98–527, against Officer Bright for false arrest during the December 22, 1998 traffic stop. Pls.' Ex. 24. Kareem alleged that he explained that the

42. The "Notice of Appearance" issued by Officer Barrett following the November 22, 1998 arrest ordered Kareem to appear at 34 S. 11th Street on January 13, 1999 at 8:00 a.m. Pls.' Ex. 23 at 472. The conflicting notice, which was issued on November 4, 1998, ordered Kareem to appear at municipal court at 21st and Hamilton Streets on January 13, 1999 at 8:00 a.m. Pls.' Ex. 23 at 472. Both notices appear in the investigation materials collected by Lieutenant Blackwell.

43. Officer Bright did not testify at trial; information regarding her vehicle stop of Kareem is found in the IAD investigation.

44. The IAD investigation report described the identification process in that, per departmental policy, "all individuals suspected of Contempt of Court must first be positively identified via fingerprinting and confirmation identity through the Offender Processing Unit." Pls.' Ex. 24 at 252.

warrant was invalid and he subsequently was held in custody for over eight hours before his release. Pls. Ex. 24 at 256. IAD assigned Sergeant Joseph Rossa to investigate the complaint.[45] Pls.' Ex. 24 at 252. Sergeant Rossa interviewed Kareem and Officer Bright. He also contacted the Warrant Unit to determine the validity of the bench warrant and the process by which it could be removed from the police system. According to the IAD report, Sergeant Rossa spoke with Ms. Doris Fowler of the Pretrial Services Division Warrant Unit. Pls.' Ex. 24 at 263. According to Ms. Fowler, the warrant was entered into the system on September 23, 1998, but the warrant was no longer valid since the case had been dismissed on October 4, 1998. Pls.' Ex. 24 at 263. Therefore, at the time of arrest, the warrant was no longer valid.[46] Pls.' Ex. 24 at 263.

According to the IAD report, Sergeant Rossa also contacted then-Sergeant, now Lieutenant Joseph Lapetina in the Police Department's Data Processing Unit to find out how to get the warrant removed from the police computer. Pls.' Ex. 24 at 267. Lieutenant Lapetina explained to Sergeant Rossa how warrant messages are entered into and deleted from the computer system through a tape created by court system employees. Pls.' Ex. 24 at 267. No Police Department employees are able to enter or remove bench warrants from the system. Pls.' Ex. 24 at 267.

At the conclusion of his investigation, Sergeant Rossa exonerated Officer Bright of any allegations of false arrest. Pls.' Ex. 24 at 254. Upon finding a wanted message in the police system, Officer Bright "was obligated to detain Kareem Glass until proper verification can [sic] be completed." Pls.' Ex. 24 at 254. Furthermore, Sergeant Rossa determined that Kareem's claim that he spent eight hours in a holding cell was unfounded because he was released within three and a half hours of his arrest, a period that "is not excessive based on the procedures and regulations currently in place for handling wanted persons." Pls.' Ex. 24 at 254.

d. *December 30, 1998 arrest and IAD 99–02*

On December 30, 1998, around 1:30 p.m., Kareem, his daughter and Shanta Key, the child's mother, were leaving Jefferson Hospital on 10th and Chestnut Streets. Pls.' Ex. 26 at 109. Kareem was arrested by Officers Christian Duchossois and David Bembischew,[47] of the Sixth District, who discovered he was wanted on the same FTA bench warrant. Pls.' Ex. 26.

According to Officers Duchossois and Bembischew, the vehicle was illegally parked, no one was in the driver's seat and there was a passenger, Sharrod Reddy, waiting in the car. Pls.' Ex. 26 at 103. Upon approaching the car, the officers noticed that the VIN plate which was visible through the windshield, did not appear to match the vehicle, and that there were no inspection stickers and that the vehicle's registration was expired. Pls.' Ex. 26 at 121–25. The officers first approached Mr. Reddy, the passenger, who said he was not the owner or operator of the vehicle and he was waiting for a friend. Shortly

---

**45.** Sergeant Rossa did not testify at trial.

**46.** The reason the warrant was no longer valid is unclear. The IAD investigation reports related to the FTA warrant conclusively state the invalidity of the warrant, but do not explain the reasons for that finding other than that the case had been disposed of. Therefore, the Court is unable to make a specific factual finding as to why the FTA bench warrant was no longer valid.

**47.** Officers Duchossois and Bembischew did not testify at trial.

thereafter, Kareem exited the hospital and approached the driver's side of the vehicle. When Kareem could not produce a driver's license, the officers ran his name on the Police Department computer in their patrol car and discovered the bench warrant. Kareem was taken back to the Sixth District, where officers called the Warrant Unit to determine the validity of the warrant. Upon learning that the warrant was invalid, Kareem was released from custody.

Kareem filed a complaint, IAD 99–02, against the officers for the December 30, 1998 arrest and for harassment. Pls.' Ex. 26 at 109. According to Kareem, the officers arrested him despite his protests that the warrant was invalid. IAD Sergeant Connie Hurst was assigned to investigate the complaint. She interviewed Kareem, Shanta Key, Officers Duchossois and Bembischew, two other officers assigned to the Sixth District on the date of the arrest and Lieutenant Lapetina. Pls.' Ex. 26 at 101. Sergeant Hurst concluded that the allegations of harassment were unfounded because the arresting officers did not know Kareem prior to that date (and in fact were assigned to a different Police District) and the officers followed the proper procedures, releasing Kareem when they discovered the warrant was invalid. Pls.' Ex. 26 at 107.

e. *January 13, 1999 arrest and IAD 99–037*

On January 13, 1999, Kareem was driving a car, again without a driver's license. Ninth District Officers Campbell and Gill stopped Kareem's car because he allegedly was driving recklessly for the weather conditions, which the officers described as freezing rain and snow-covered roads.[48] After stopping the car, the officers ran Kareem's name and discovered there was an FTA bench warrant for Kareem's arrest. The officers ordered Kareem to exit the vehicle, at which time the officers observed a gun protruding from the door panel of the vehicle. Kareem was arrested for violating the Uniform Firearms Act and was issued three traffic citations for having an unregistered vehicle, for being an unlicensed driver and for careless driving.

Mr. Glass filed a complaint, IAD 99–037, complaining that Kareem was arrested for the fourth time pursuant to an invalid bench warrant.[49] Pls.' Ex. 29. IAD assigned Sergeant Sandra McCreesh to investigate the complaint.[50] Defs.' Ex. 9. According to the IAD report, Sergeant McCreesh interviewed Officers Gill and Campbell, but neither Mr. Glass nor Kareem appeared for an interview. Defs.' Ex. 9 at 2. Sergeant McCreesh, according to the IAD investigation report, exonerated Officers Gill and Campbell of false arrest because they relied on a warrant message in the computer system and had no knowledge that the warrant was invalid. Defs.' Ex. 9 at 5. Moreover, the IAD investigation revealed that Kareem's allegations of harassment were unfounded. Defs' Ex. 9 at 5.

8. *Officers announce Kareem's arrest over the loudspeaker and 99–028*

On January 13, 1999, immediately after one of Kareem's arrests, two white male

---

**48.** Plaintiffs argued at trial that Kareem was not driving carelessly and that the weather conditions were not hazardous. Plaintiffs' counsel challenged Officer Campbell's testimony during trial by presenting a national weather report, which stated that "from 4:00 in the afternoon until 10:00 at night, the temperature never exceeded a range from 54 degrees to 33 degrees." Trial Tr. 115:2–4, Feb. 23, 2006.

**49.** In the complaint, there was no reference to the gun found in the vehicle. Pls.' Ex. 29.

**50.** Sergeant McCressh did not testify at trial.

Ninth District police officers drove past Mr. Glass's house in a police car and announced over the car's loudspeaker "we just arrested Kareem Glass." Pls.' Ex. 28 at 1.[51] Anthony Fisher, a local pizza deliverer, was in the neighborhood and heard the officers make this statement over the loudspeaker after witnessing the officers arrest Kareem at 19th and Master Streets, near the Glass home.[52] Pls.' Ex. 28 at 21. Fisher recognized the car as Mr. Glass's because it was a "souped up hot rod." Pls.' Ex. 28 at 21.

Mr. Glass filed a citizen's complaint, IAD 99–028, about the officers' conduct. Pls.' Ex. 28. The complaint was assigned to Lieutenant Joseph Sweeney for investigation. Pls.' Ex. 28 at 10. Lieutenant Sweeney interviewed Mr. Glass and Anthony Fisher. Based upon the information obtained from Fisher, who Lieutenant Sweeney considered to be an independent and neutral witness, Lieutenant Sweeney concluded that Mr. Glass's allegation that two officers rode past the Glass house and made the announcement over the police loudspeaker was sustained.

Lieutenant Sweeney testified that his conclusion that the complaint should be sustained was largely based upon the witness, Anthony Fisher, who was "an independent witness that did not have a stake in the outcome of the investigation." Trial Tr. 86:3–5, Feb. 21, 2006. The investigation did not determine the identity of the officers involved.[53] This is the only allegation of harassment by Ninth District police officers against the Glass family that was sustained following an IAD investigation.

### 9. Mr. Glass's dealings with the Philadelphia Parking Authority and IAD 99–023

On January 12, 1999, Mr. Glass filed a citizen's complaint, IAD 99–023, against Inspector Tiano and Captain Ditchkofsky alleging a pattern of harassment by Ninth District officers at the direction of the Inspector and the Captain. Pls.' Ex. 27 at 13.[54] According to the complaint, Mr. Glass alleged that both Inspector Tiano

**51.** Plaintiffs' Exhibit 29 does not contain bates numbers; therefore, the Court numbered each page consecutively for identification purposes.

**52.** Mr. Glass explained that he heard the announcement being made; but according to Fisher, Mr. Glass did not hear the announcement. Instead, Fisher said he repeated the announcement to Mr. Glass and then told Mr. Glass he had seen the officers arresting Kareem. Pls.' Ex. 28 at 21.

**53.** Plaintiffs highlighted that Lieutenant Sweeney could have determined the identity of the officers. Lieutenant Sweeney testified that he determined from the assignment sheets and the patrol logs for the evening of January 13, 1999, that there were only two "two-male cars" in the Ninth District that night. The officers on duty were Officers Gill and Campbell, who were partnered together, and Officers Welsh and Andrejczeck, who also were partnered together. Trial Tr. 83, 4–9,

Feb. 21, 2006. According to the IAD investigation report, Mr. Glass informed Lieutenant Sweeney during his interview that he may be able to identify the officers if he saw them again. Therefore, plaintiffs argue that Lieutenant Sweeney could have shown Mr. Glass pictures of the officers to reveal who harassed the Glasses. At trial, Lieutenant Sweeney explained that he "made a judgment" to rely on the witness Anthony Fisher because Lieutenant Sweeney did not believe that Mr. Glass "had seen the officers based on the information I [Lieutenant Sweeney] got from the witness." Trial Tr. 86:3–15, Feb. 21, 2006. Therefore, plaintiffs' argument that Mr. Glass may have been able to identify the officers has no bearing on the accuracy of the investigation because plaintiffs' complaint was sustained.

**54.** Plaintiffs' Exhibit 27 does not contain bates numbers; therefore, the Court numbered each page consecutively for identification purposes.

and Captain Ditchkofsky made inappropriate remarks to him as he attempted to file a citizen's complaint. Allegedly, Inspector Tiano asked Mr. Glass "what's that, 20 or 21?" as Mr. Glass attempted to file a complaint. Pls.' Ex. 27 at 16. Moreover, Mr. Glass alleges that Captain Ditchkofsky told him that Kareem was a drug dealer and threatened to have Mr. Glass investigated for his dealings with the Philadelphia Parking Authority ("PPA") if he continued to file citizens' complaints. Pls.' Ex. 27 at 16. In addition, Mr. Glass alleged that these comments were part of an ongoing pattern of harassment by Ninth District officers targeted at the Glass family.

IAD assigned the complaint to Lieutenant William McCarthy. Lieutenant McCarthy testified at trial that he investigated not only the alleged comments of Inspector Tiano and Captain Ditchkofsky, but that he also investigated allegations that there was a pattern of harassment. According to the IAD investigation report, Lieutenant McCarthy obtained copies of eleven other IAD complaints filed by Mr. Glass. Lieutenant McCarthy testified at trial that he read the IAD file for each complaint to investigate Mr. Glass's claim of harassment. Trial Tr. 131:8–132:8, Feb. 26, 2006.

Lieutenant McCarthy's investigation concluded that Mr. Glass's allegations that Inspector Tiano and Captain Ditchkofsky were responsible for a pattern of harassment were unfounded. Pls.' Ex. 27 at 8. Moreover, his complaints regarding comments made by Inspector Tiano and Captain Ditchkofsky were not sustained by the IAD investigation. Pls.' Ex. 27 at 8.

Lieutenant McCarthy's investigation revealed that Captain Ditchkofsky had in fact recommended an investigation of Mr. Glass's dealings with the PPA auctions. According to the IAD report, Captain Ditchkofsky referred the matter for investigation based on the numerous traffic violations issued to unlicensed drivers who were operating cars purchased by Mr. Glass at PPA auctions. According to Captain Ditchkofsky, Mr. Glass's vehicles often were unregistered and uninsured, and Mr. Glass often loaned or illegally transferred those vehicles to others. Moreover, Captain Ditchkofsky referred to Mr. Glass's friendship with Ms. Malloy, a PPA employee who used to work at the auctions. The investigation revealed no criminal conduct by Mr. Glass; however, it did reveal several motor vehicle violations, including the fact that many vehicles purchased by Mr. Glass remained unregistered and uninsured after purchase. The investigation did not reveal any wrongdoing by Ms. Malloy or any other parking authority employee involved with the auctions. Pls.' Ex. 25. No criminal complaint was lodged against Mr. Glass or Ms. Malloy as a result of this investigation.

These contacts between the Glass family and members of the Philadelphia Police Department described above form the basis of plaintiffs' claims against defendants for constitutional violations and violation of state law.

### C. *Summary*

On balance, plaintiffs' case-in-chief focused on the following events to support their claims of civil rights violations at the hands of the City of Philadelphia and certain officers assigned to the Police Department's Ninth District [55]:

---

**55.** In addition to contacts between the Glass family and members of the Philadelphia Police Department described in detail above, plaintiffs submitted exhibits to the Court involving allegations of conduct that occurred after the lawsuit in *Glass II* was filed. *See* Pls.' Sch. of Ex. (listing other IAD complaints and arrests in addition to those addressed

1. August 1997, activity in the vacant lot across from the Glass home begins.

2. January 1, 1998, Kareem is arrested by Officers Marcus and McKenny for possession of marijuana. Mr. Glass files a complaint and claims that his statements to Lieutenant Lampe and Sergeant Craighead, who are investigating the complaint, are incorrectly recorded.

3. February 10, 1998, Mr. Glass and Kareem are arrested by Officers Vales and Rockeymore. On February 12, 1998, Mr. Glass and Ms. Malloy attend a meeting at the Ninth District to address the February 10, 1998 incident.

4. May 6, 1998, the trial of *Glass I* is interrupted with news that Kareem is going to be arrested for the Derek Bohannon assault charge. Kareem surrenders himself on May 7, 1998 at the Central Detectives division.

5. August 31, 1998, Kareem is arrested while driving Ms. Malloy's car.

6. September 16, 1998, Officer McKenny follows Mr. Glass and Kareem home after a preliminary hearing for the Bohannon case. McKenny allegedly tells Kareem "I'm going to fuck you up."

7. November 22, 1998, Kareem is arrested pursuant to an FTA bench warrant in the Bohannon case.

8. December 22, 1998, Kareem is arrested for the second time pursuant to an FTA bench warrant in the Bohannon case.

9. December 30, 1998, Kareem is arrested for the third time pursuant to

an FTA bench warrant in the Bohannon case.

10. January 13, 1999, Kareem is arrested for the fourth time pursuant to an FTA bench warrant in the Bohannon case.

11. January 13, 1999, two officers drive past the Glass house and announce on the loudspeaker "we just arrested Kareem Glass."

12. January 12, 1999, Mr. Glass files a citizen's complaint against Inspector Tiano and Captain Ditchkofsky alleging a pattern of harassment, which included a threat allegedly made by Captain Ditchkofsky to have Mr. Glass investigated for his dealings with the PPA.

Plaintiffs also highlighted the following IAD complaints, which correspond to the above events [56]:

1. IAD 98–04 relates to the January 1, 1998 arrest of Kareem.

2. IAD 98–132 is Mr. Glass's complaint of physical abuse against Officer Rockeymore for the February 10, 1998 arrest.

3. IAD 98–369 is a complaint against Officer McKenny for telling Kareem "I'm going to fuck you up."

4. IAD 98–502 relates to the November 22, 1998 arrest pursuant to the FTA bench warrant.

5. IAD 98–527 relates to the December 22, 1998 arrest pursuant to the FTA bench warrant.

6. IAD 99–02 relates to the December 30, 1998 arrest pursuant to the FTA bench warrant.

above). Those contacts were not presented to the Court during the plaintiffs' case-in-chief and will not be considered by the Court to support a finding of liability.

**56.** Again, plaintiffs submitted additional IAD complaints to the Court as exhibits that were not presented as part of plaintiffs' case-in-chief and will not be considered by the Court.

7. IAD 99–037 relates to the January 13, 1998 arrest pursuant to the FTA bench warrant.

8. IAD 99–028 relates to the January 13, 1998 loudspeaker announcement "we just arrested Kareem Glass."

9. IAD 99–023 relates to Mr. Glass's complaint that Captain Ditchkofsky threatened to have Mr. Glass investigated for his dealings with the PPA.

## V. CONCLUSIONS OF LAW AND DISCUSSION

Plaintiffs allege liability from the contacts with the Philadelphia Police Department described above. According to plaintiffs, defendants violated their constitutional rights and are liable under 42 U.S.C. §§ 1983, 1985(2) and 1986. In addition, plaintiffs also allege false imprisonment and false arrest, and assault and battery. The Court will address each claim below, identifying which events and which defendants are implicated by each claim of liability.

### A. The Scope of the Release

The scope of the release signed pursuant to the settlement of *Glass I* is a threshold issue. Defendants asserted the release as an affirmative defense and addressed the issue in their proposed findings of fact and conclusions of law.[57]

57. Defendants did not assert the general release as an affirmative defense in their initial answer to plaintiffs' complaint. The release became an issue in the case when the Court inquired as to the applicability of the release during a hearing, which prompted defendants to address the issue. *See* Order of Jan. 15, 2004, n.1 (doc no. 80) ("The defendants' argument concerning the release signed by Kareem Glass has not been pled as an affirmative defense, nor was it argued by the defendants in their motion for partial summary judgment. The only reference to the effect of the release was made by the Court at the hearing on the motion for partial summary judgment, and was not well taken by the defendants. [Hr'g] Tr. at 37–38, [Dec. 3, 2003].").

On February 12, 2004, defendants moved to amend the answer to include the release as an affirmative defense (doc. no. 88). The Court granted the motion and extended discovery to allow the parties to discover information relating to the release (doc. no. 93). Defendants filed an amended answer on February 23, 2004 (doc. no. 95). Thereafter, defendants filed a second motion for partial summary judgment on the issue of the release. After hearing oral argument from the parties on May 6, 2005, the Court denied defendants' partial summary judgment motion (doc. no. 123), determining that the language of the release was ambiguous. The Court stated:

Plaintiff Kareem Glass executed a general release on May 29, 1998. According to the general release, Plaintiff Kareem Glass remised, released, and forever discharged certain Defendants "for a claim arising from an incident at Uber & Parrish Streets on July 10, 1995, as stated in plaintiffs' claim." The meaning of this quoted provision is a source of dispute. On the one hand, this provision could mean that the release applies only to causes of action for which suit was brought in Plaintiff's first complaint (i.e., the 1996 lawsuit). This reading would be analogous to the release in *Harrity v. Medical College of Pennsylvania Hospital*, 439 Pa.Super. 10, 653 A.2d 5, 10 (Pa.Super.1994), where the release identified the lawsuit in question by name and civil action number. On the other hand, if this provision includes any claims generally flowing from the July 10, 1995 incident, then it falls outside the purview of *Harrity* and would cover any conduct by Defendants that occurred before May 29, 1998. Thus, the scope of the provision has two reasonable interpretations. As such, the Court finds the provision to be ambiguous. Nor does the Court detect the sufficient quantum of objective extrinsic evidence from which to ascertain the intentions of the parties. *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir.2001).

Order of May 9, 2005, n.1 (doc. no. 123).

Plaintiffs argue that any consideration of the release by the Court would prejudice plaintiffs, who did not elicit testimony or present other evidence concerning the scope

The release became relevant in *Glass II.* In denying defendants' second motion for summary judgment, the Court determined that the release was ambiguous because it was subject to at least two different interpretations. First, the scope of the release could apply only to causes of action for which suit was brought in plaintiffs' first complaint, i.e. the actual beating of Kareem and any injuries he sustained from that beating, and nothing more. Second, the release could apply to any claims generally flowing from the July 10, 1995 incident, which would cover any conduct by defendants that occurred before May 29, 1998—an interpretation that would include several of the incidents plaintiffs allege constitute harassment in the instant case, *Glass II.*

 Under Pennsylvania law, "[t]he effect of a release is determined by the ordinary meaning of the language contained therein." *Buttermore v. Aliquippa*

*Hosp.,* 522 Pa. 325, 561 A.2d 733, 735 (1989). "A release not procured by fraud, duress or mutual mistake is binding between the parties."[58] *Strickland v. Univ. of Scranton,* 700 A.2d 979, 986 (Pa.1997). The court noted that *Harrity v. Medical College of Pennsylvania Hospital,* 439 Pa.Super. 10, 653 A.2d 5, 10 (1994), was instructive. In *Harrity,* the plaintiff was injured during a fall in a hotel lobby. The plaintiff, after receiving treatment, later suffered more injuries and filed a medical malpractice suit against her treating physician. After receiving several corrective surgeries, the plaintiff filed another medical malpractice suit against her surgeon. *Id.* at 6. In all, the plaintiff filed three lawsuits.

The plaintiff in *Harrity* then settled her action against the hotel. Both the treating physician and the surgeon argued that the release executed in the action against the hotel applied to the plaintiff's claims

of the release at trial due to defendants' failure to argue the release as an affirmative defense during trial. The Court addressed this issue with the parties during closing arguments, determining that the dearth of evidence at trial as to the release "may have to do [with] whether or not it [the release] applies," but not whether the Court as factfinder may consider the release. Trial Tr. 109:5–14, June 28, 2006. As to the latter, the Court noted that the release was pleaded as an affirmative defense and "was always in the case." Trial Tr. 108:15, June 28, 2006. Therefore, plaintiffs are not prejudiced by the Court's consideration of the release.

**58.** The plaintiffs do not specifically argue that the release was executed under fraud or duress, but they do so indirectly by noting that the plot to arrest Kareem during the trial of *Glass I* was an attempt to force plaintiffs to settle the case. Plaintiffs' argument would include allegations that the release was procured by duress because Kareem was arrested during trial, the witnesses had refused to return to court, and the plaintiffs' expert may not have been able to testify later were the trial continued.

Under Pennsylvania law, duress is "that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient to overcome the mind of a person of ordinary firmness." *Carrier v. William Penn Broad. Co.,* 426 Pa. 427, 233 A.2d 519, 521 (1967). Moreover, "in the absence of threats or actual bodily harm, there can be no duress where the contracting party is free to consult with counsel." *Strickland v. Univ. of Scranton,* 700 A.2d 979, 986 (Pa.1997) (citing *Carrier,* 233 A.2d at 521). Here, Mr. Glass and Kareem consulted with counsel regarding the settlement and the release. Although certain pre-release conduct was physically threatening, including the February 10, 1998 incident in front of the Glass home, it was several months removed from the execution of the release. Moreover, the Court conducted an extensive colloquy of Mr. Glass on the record in open court regarding the settlement. In addition, Mr. Glass testified in *Glass II* that he "had confidence in ... counsel" to adequately "express whatever positions [he] would want to tell to the Court." Trial Tr. 74:9–76:7, Jan. 19, 2006. Therefore, there is no evidence that the release was executed under duress.

against them. First, the court noted certain general contract principles. If the language of the release is clear, the court need only examine the language itself to ascertain the parties' intent. *Id.* at 10. If, however, the language of the release is ambiguous, the court may look to parol evidence to determine the parties' intent. *Id.* Second, the court identified certain factors to be considered when ascertaining the parties' intentions when the language of the release is ambiguous, such as "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." *Id.* at 10 (quoting *Wrenfield Homeowners Ass'n v. DeYoung,* 410 Pa.Super. 621, 600 A.2d 960, 963 (1991)). The Pennsylvania Supreme Court has stated that "[i]f there is any doubt or ambiguity in the contract, it must be construed against the defendant who is the party who wrote it." *Home Builders of Mercer County, Inc. v. Dellwood Corp.,* 379 Pa. 255, 108 A.2d 731, 732 (1954) (citation omitted).

The relevant language of the release at issue in *Harrity* stated that plaintiff "released Claridge Hotel and any other person or corporation from all actions or claims arising out of an accident which occurred June 22, 1986 'and for which suit was brought in the United States District Court for the Eastern District of Pennsyl-

vania at Civil Action No. 88–4913, styled: *Sarah T. Harrity vs. Claridge at Park Place, Inc.....' " Id.* at 13, 653 A.2d 5.[59] The Pennsylvania Superior Court held that the release applied only to the plaintiff's claims against the hotel and not to her claims against the treating physician or the surgeon. The court found that the language naming the date of the action and the name and civil action number of the case was "extremely clear limiting language." *Id.* at 11. The court also considered other extrinsic evidence, which included: (1) a copy of the complaint in the action against the hotel, which was devoid of any language referring to the subsequent medical malpractice claims; (2) an affidavit of the lawyer who negotiated the release that the release "was intended to apply to the 'Claridge [Hotel] case only,' "; and (3) the circumstances surrounding the execution of the release, such as the "nominal amount, [which was] commensurate with the limited liability of the Claridge Hotel." *Id.*

Here, the Court's order denying defendants' second motion for summary judgment instructed the parties that extrinsic evidence was needed to interpret the ambiguous language of the release. The relevant language of the release at issue is very similar to the release interpreted in *Harrity.* Here, the release language re-

---

**59.** The language of the release in *Harrity* in its entirety is as follows:

KNOW ALL MEN BY THESE PRESENTS that Sarah T. Harrity, (hereinafter referred to as Releasor) for and in consideration of the sum of six hundred dollars ($ 600.00) in hand paid does hereby for herself and her administrators, successors and assigns, remise, release, acquit and forever discharge Claridge Hotel and Casino, their heirs, executors, administrators and assigns as well as their insurance carriers, and/or any other person, firms, corporations or entities (Releasees) of and from all, and all manner of, actions and causes of actions,

suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity ***arising out of an accident which occurred June 22, 1986*** and for which suit was brought in the United States District Court for the Eastern District of Pennsylvania at Civil Action No. 88-4913, styled: *Sarah T. Harrity vs. Claridge at Park Place, Inc.,* which against the releases, Sarah Harrity ever had, now has, for, or by reason of any cause, matter or thing whatsoever, from the beginning of the world to the date of these presents.

*Id.* at 10 (emphasis added).

ferred to *"a claim arising from an incident at Uber & Parrish Streets on July 10, 1995,* as stated in plaintiffs' claim." Gen. Release, May 29, 1998 (emphasis in original). However, unlike the attorney's affidavit before the court in *Harrity,* Michael Resnick, the City Solicitor who drafted the release in *Glass I* and who testified at trial in *Glass II,* did not testify concerning the parties' intentions regarding the scope of the release. Mr. Glass testified at trial that he thought Kareem was settling the case to "drop[ ] the lawsuit ... [f]or Kareem getting beaten by the police." Trial Tr. 3:21–4:12, Jan. 19, 2006. Plaintiffs cite deposition testimony of Kareem, wherein Kareem could not recall signing the release and did not know what "release" meant. Pls.' Reply to Defs.' Prop. Findings at 15–16. There was no other evidence introduced by either party at trial regarding the meaning of the release.

■ Therefore, because the ambiguity is to be construed against the party who drafted the language, *Dellwood Corp.,* 108 A.2d at 732, and the City of Philadelphia is the party who drafted it, the Court finds that the release covers the actual beating of Kareem on July 10, 1995 and any injuries he sustained from that beating, and nothing more. That conclusion is based upon the plain language of the release and the parties' intent, as gleaned from the dearth of evidence at trial. The release does not apply to any claims generally flowing from the July 10, 1995 incident. Thus the alleged harassment of the Glasses that occurred before May 29, 1998—the date Kareem signed the release—is properly before the Court.

**B.** *Section 1983 Liability*

■ Plaintiffs allege that both the City of Philadelphia and the individual defendants are liable under 42 U.S.C. § 1983 for the alleged pattern of harassment by Ninth District police officers against the Glass family. To prevail in a § 1983 action, a plaintiff must demonstrate that: "(1) the defendants acted under color of law; and (2) their actions deprived [the plaintiff] of rights secured by the constitution or federal statutes." *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997).

As to the first element, defendants in this action are members of the Philadelphia Police Department and exercised power possessed by virtue of state law and made possible because their conduct was cloaked with the authority of state law. *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citing *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Therefore, it is undisputed that the defendants in this action were acting "under color of state law."

As to the second element, the Court must determine whether the defendants' actions deprived plaintiffs of any right(s) guaranteed by the Constitution. To that end, plaintiffs have filed § 1983 claims against both the City of Philadelphia and against individual members of the Philadelphia Police Department. The Court will address (1) municipal liability and (2) individual liability, respectively.

1. *Municipal Liability Under § 1983*

Plaintiffs' argument for municipal liability is threefold: (1) plaintiffs allege the police commissioner had actual knowledge of the conspiracy to interfere with the trial of *Glass I* and to retaliate against the Glass family for filing *Glass I,* and was deliberately indifferent to that information; (2) plaintiffs allege the City had a policy of unlawfully arresting citizens in the form of an "investigatory detention"; and (3) plaintiffs allege the City had a policy of maintaining an inadequate process for investigating citizens' complaints

filed against police officers. Pls.' Prop. Findings ¶ 2410 (doc. no. 202).

■ "In *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that a municipality cannot be held liable under § 1983 for the constitutional torts of its employees by virtue of respondeat superior." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir.2005). The Third Circuit has summarized municipal liability under § 1983 as follows:

[A] municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

*Id.*

Here, plaintiffs allege the City is liable under § 1983 pursuant to the first prong described above, i.e. the City of Philadelphia had a policy or custom that led to the deprivation of certain constitutional rights. A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing body's] officers." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir.1991) (quoting *Monell*, 436 U.S. at 690,

98 S.Ct. 2018). A municipal custom consists of "such practices of state officials . . . [as are] so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). A custom lacks the formal approval of a municipal policy, *id.*, and "may be established by evidence of knowledge and acquiescence." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (citing *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir.1989)).

■ Moreover, "plaintiff[s] must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Deliberate indifference is the result of " 'a deliberate choice to follow a course of action [that] is made from among various alternatives' by city policymakers." *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality) (Brennan, J.)). "It is a particularly wilfull type of recklessness that is inherent in the deliberate indifference standard." *Simmons*, 947 F.2d at 1060 n. 13. That indifference must be attributed to "lawmakers or other officials with the authority to make municipal policy." *Id.* at 1059. Whether one has the authority to formulate official municipal policy is a matter of state law. *Id.* at 1061–62. The Third Circuit has held that "neither [an unconstitutional municipal policy or custom] could be established absent conscious decisionmaking or acquiescence in a longstanding custom or practice on the part of a policymaker." *Id.* at 1064 (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481 (3d Cir.1990)). Negligence on the part of state officials is not enough to

impute liability under § 1983. *See generally Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

 Finally, the plaintiffs must prove causation. The Third Circuit explained that "proof of the existence of a policy or custom alone is insufficient to maintain a § 1983 action. The plaintiff bears the burden of proving that the municipal practice was the proximate cause of the injuries suffered." *Beck,* 89 F.3d at 972 n. 6 (citing *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990)). The court further explained:

> [T]o sustain a § 1983 claim for municipal liability, the plaintiff "must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."

*Id.* at 972 (quoting *Bielevicz,* 915 F.2d at 851).

Therefore, as to each of plaintiffs' three allegations as a basis of municipal liability, plaintiffs must: identify the constitutional right at issue, identify the policy or custom at issue, identify the policymaker, demonstrate deliberate indifference or evidence of knowledge and acquiescence by the policymaker and demonstrate causation. The Court will address each of plaintiffs' arguments in support of municipal liability below.

### a. Municipal liability from the police commissioner

First, plaintiffs argue that the City of Philadelphia is liable pursuant to § 1983 because the police commissioner had knowledge that Ninth District officers were harassing the Glasses and failed to prevent that harassment. The police commissioner's knowledge, according to the plaintiffs, is rooted in three pieces of evidence: (1) a letter Mr. Glass sent to Captain Ditchkofsky, complaining about police misconduct by Ninth District officers, with carbon copies to Police Commissioner John Timoney and others, Pls.' Prop. Findings ¶ 2422; (2) the Police Department's policy that an IAD complaint was ultimately submitted to the police commissioner for his review and signature, Pls.' Prop. Findings ¶ 2424; and (3) the Glasses' complaints against the Ninth District officers that were mentioned at the monthly CompStat meetings, Pls.' Prop. Findings ¶ 2449. Plaintiffs allege that these three avenues, all of which lead to or involve the police commissioner, prove that the police commissioner had knowledge of the Glasses' numerous complaints and the pending lawsuit, *Glass I,* and failed to take corrective action.

Within the rubric of municipal liability outlined above, the policy or custom identified by plaintiffs is the commissioner's failure to prevent future harassment of the Glasses and interference with *Glass I* by Ninth District officers, and the inadequacy of IAD investigations. Plaintiffs identify the policymaker as Police Commissioner John Timoney, who was the police commissioner during the relevant time period. Commissioner Timoney, according to plaintiffs, was deliberately indifferent to the Glasses' pleas for help by allegedly failing to act upon notice of their complaints.[60]

 As an initial matter, the police commissioner, as the highest official within the Philadelphia Police Department, is a policymaker for purposes of municipal liability under § 1983. *See, e.g., Andrews v. City of Philadelphia,* 895 F.2d 1469, 1481

---

**60.** Commissioner Timoney was not a witness and did not testify at trial in *Glass II.*

(3d Cir.1990) (finding that the police commissioner of the Philadelphia Police Department was a policymaker because he promulgated a training manual and regulations and "retained the authority to measure" the conduct of the officers at issue). Liability will attach only if the police commissioner acted either with deliberate indifference or had knowledge of and acquiesced to an unconstitutional policy or custom. The Court will examine the three pieces of evidence proffered by plaintiffs.

First, Mr. Glass's April 3, 1998 letter to Captain Ditchkofsky did not provide notice to the police commissioner. There was no evidence to show the commissioner received much less read the letter, which was addressed to Captain Ditchkofsky and only carbon copied to the commissioner. Therefore, the April 3, 1998 letter is not a means by which plaintiffs can show the commissioner had actual or imputed knowledge of the Glasses' complaints.

Second, it is true that the chain of command through which complaints are processed for review may be relied upon to demonstrate the police commissioner's knowledge. *Beck,* 89 F.3d at 973. However, there must still be some evidence of deliberate indifference or acquiescence on the part of the police commissioner. *See Simmons,* 947 F.2d at 1064. Plaintiffs have shown none.

Third, it is also true that the police commissioner's presence at the CompStat meetings likewise is insufficient to demonstrate that he had knowledge of the Glasses' complaints. Deputy Commissioner Norris testified that the purpose of the CompStat meetings was to address, *inter alia,* the crime rate in each district and measures to affect that crime rate, police automobile accidents, complaints against police officers and overtime budgets. Trial Tr. 24:2–6, Feb. 1, 2006. There was, however, conflicting testimony regarding the extent, if any, to which the Glasses' complaints against police were discussed by name at the monthly CompStat meetings. Again, plaintiffs failed to present any evidence of deliberate indifference or acquiescence by the police commissioner, even if he did have knowledge regarding the Glasses' complaints.

In essence, both the second and third prongs of plaintiffs' argument question the sufficiency and legitimacy of the process employed by the Philadelphia Police Department to investigate citizens' complaints against police officers. The Third Circuit has held that the existence of a review process alone is insufficient to prevent a finding of municipal liability. *Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3d Cir.1996) ("We reject the district court's suggestion that mere Department procedures to receive and investigate complaints shield the City from liability."). Rather, the process for reviewing citizens' complaints against police officers must be "real." That is, "It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligations to its citizens." *Id.* (citing the appellant's brief).

In *Beck,* 89 F.3d at 973, the Third Circuit held that the chief of police had knowledge of the complaints filed against one officer over a period of five years by virtue of the chain of command. There, several citizens had filed excessive force claims against the officer at issue in a relatively short period of time. The court determined that whether the system in place for handling citizens' complaints was deficient was an issue for jury consideration.

The plaintiff in *Beck* presented evidence that the review process itself was flawed. An employee of the Office of Professional Standards ("OPS")—the division that in-

vestigated complaints against officers— testified as to the inadequacy of the review process. The court determined that a reasonable jury could conclude that the OPS review policy "was inadequate to protect civilians from police misuse of force." *Id.* at 974. That inadequate policy included the absence of formal procedures to track complaints against individual officers and a procedure to give special consideration to police officers' statements over the complainants' statements. Finally, there was an end of year report, circulated within OPS, that acknowledged a problem with excessive force complaints and an inadequacy of the procedures to handle such complaints. *Id.* at 974–75. The Third Circuit, however, did not conclude whether the evidence supported a finding of liability, but left that issue for the trier of fact. *Id.* at 976.

 The evidence before the Court, unlike the evidence in *Beck*, shows that the Philadelphia Police Department's review policy for citizens' complaints "has teeth." Here, IAD was a separate division from the individual districts and reported through a separate chain of command. IAD determined whether each citizen's complaint would be investigated by IAD or by the district captains. The system for investigating citizens' complaints, whether by IAD or the district captains, provided for the appointment of a superior officer who was expressly charged with conducting interviews.

Deputy Commissioner Norris testified that the verbal abuse and lack of service complaints assigned to the district captains for investigation followed essentially the same process as those investigated by IAD. In both instances, a captain would delegate the task of conducting the investigation, such as interviewing the complain-

ant and witnesses, to a lieutenant. The captain was still responsible for signing off on the investigation. The investigation report was then submitted through the chain-of-command, where an inspector would sign off on the investigation report and send it up to the deputy commissioner of IAD and then to the police commissioner. If there were any questions or deficiencies in the investigation at any stage in the review process, it would be sent back for corrections. The corrections could be in the form of an oral report or a change in the investigation report. Trail Tr. 121–124, Feb. 15, 2006, vol. I.

The system was commensurate with the "best practices" employed by other police departments of similar size. Trial Tr. 14:13, Feb. 15, 2006, vol. I. Moreover, unlike the plaintiff in *Beck* who presented "considerably more than Beck's complaints from which a reasonable jury could have found that the City procedures were inadequate," *id.* at 974, plaintiffs here did not present any evidence that the IAD investigation process was flawed other than Mr. Glass's own allegations.[61] Nor was there any testimony, expert or otherwise, which contradicted Deputy Commissioner Norris's testimony as to the adequacy of the Police Department's investigation process.

Therefore, the Court finds that the Police Department's process for reviewing citizens' complaints is "real." *Id.* Even though the police commissioner may be deemed to have had knowledge of the Glasses' complaints, the City is not liable because there was no deliberate indifference or acquiescence on the part of the police commissioner.

b. *Municipal liability from the policy or custom of "investigatory deten-*

---

**61.** In fact, to the extent that the investigations were incomplete, it was largely due to Mr.

Glass and Kareem's own failure to cooperate during the course of the investigation.

tions"[62]

Plaintiffs also allege the City is liable for promoting a policy or custom of "investigatory detentions." Here, according to plaintiffs, the constitutional right at issue is the Fourth Amendment right to be freed from unreasonable seizures. The custom identified is the detention of citizens for investigation where probable cause to arrest is lacking. The custom is equivalent to the proverbial "taking the suspect downtown [for a talk.]"

Plaintiffs cite the testimony of Inspector Tiano that investigatory detentions were regularly done as a matter of police practice. Pls.' Prop. Findings ¶ 2456. According to plaintiffs, the City's custom of employing investigatory detentions caused a loss of freedom during the time in which Mr. Glass and Kareem were detained at the Ninth District for investigative purposes on February 10, 1998 and when Kareem was detained on August 31, 1998.

Plaintiffs' claim has merit. In 1979, the Supreme Court settled "the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Dunaway v. New York*, 442 U.S. 200, 202, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway,* a detective received a "lead" from an informant that the plaintiff was involved in a attempted robbery in which a proprietor of a pizza shop was killed. *Id.* at 202–03, 99 S.Ct. 2248. The lead was an inmate who implicated the

plaintiff, but who did not supply "enough information to get a warrant." *Id.* at 203, 99 S.Ct. 2248. The detective then ordered other detectives to "pick up" the plaintiff and "bring him in." *Id.* The plaintiff, who was not technically under arrest but was also not free to leave, was then driven to police headquarters in a police car and put in an interrogation room where he was questioned regarding the murder and incriminated himself. *Id.*

The Court in *Dunaway* determined that the police had "violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took petitioner into custody, transported him to the police station, and detained him there for interrogation." *Id.* at 206–07, 99 S.Ct. 2248. When the plaintiff was taken, involuntarily, to the police station, he was "seized" in the Fourth Amendment sense. *Id.* at 207, 99 S.Ct. 2248. Fourth Amendment seizures must be supported by probable cause, and the detective in *Dunaway* admitted he did not have probable cause to arrest the plaintiff. *Id.* at 212, 99 S.Ct. 2248. The Court, citing an earlier decision, reiterated that "[n]othing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Id.* at 214–15, 99 S.Ct. 2248 (quoting *Davis v. Mississippi,* 394 U.S. 721, 726–27, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)).[63]

---

**62.** Plaintiffs used the phrase "investigative detention" and "investigatory detention" interchangeably at trial and in their proposed findings of fact and conclusions of law. The Court will use the phrase "investigatory detention," which is commensurate with the Supreme Court jurisprudence on the issue.

**63.** In *Davis,* an 86–year–old white woman was raped in her home. She described her assailant as a young black male. No other evidence concerning the assailant's identity

was obtained other than some fingerprints left on the victim's window sill. For a period of about 10 days, officers brought at least 24 young black men to the police station for investigation without a warrant or probable cause for arrest. Plaintiff was one of the young men taken, involuntarily, to the police station to be fingerprinted. Plaintiff was released and later taken back to the police station and fingerprinted a second time, after which his fingerprints were said to match that of the assailant. The Court determined that

The Supreme Court reaffirmed *Dunaway* in *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). In *Hayes*, the plaintiff was suspected in a series of burglary-rapes in a neighborhood. The police interviewed the plaintiff in a pool of 30 to 40 other men who fit the assailant's general description. *Id.* at 812, 105 S.Ct. 1643. The plaintiff became the principal suspect, and when he expressed reluctance to go to the police station for fingerprinting, the officers threatened to arrest him. *Id.* The plaintiff went to the police station, was fingerprinted, and when his fingerprints matched those left at the scene of the crime, he was placed under arrest. *Id.* at 813, 105 S.Ct. 1643. Again relying on *Davis*, the Court stated that "our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Id.* at 816, 105 S.Ct. 1643.

The Third Circuit in *Leveto v. Lapina*, 258 F.3d 156, 169 (3d Cir.2001), applied the Supreme Court's reasoning in *Dunaway* and focused on such factors as the length of the detention, whether the plaintiff was restricted from communicating with others, whether the plaintiff was interrogated and the inconvenience and the indignity of a forced ride with authorities. It also noted that a seizure is more intrusive, and thus more likely to rise to the level of an arrest, if it "involves moving the suspect to another locale." *Id.* (quoting *Michigan v. Summers*, 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)).[64]

Two of the Glass family's contacts with the police are implicated here: one, the February 10, 1998 vehicle stop involving the black Acura; and two, the August 31, 1998 arrest of Kareem upon suspicion that he was driving a stolen car. Pursuant to the February 10, 1998 stop, Mr. Glass and Kareem were handcuffed and transported involuntarily to the Ninth District in a police car, they were not free to leave and officers lacked probable cause for an arrest. Inspector Tiano testified that it was the custom of the Philadelphia Police Department to bring suspects to the police station for investigation without probable

---

the detention during which the fingerprints were obtained was an unreasonable seizure in violation of the Fourth Amendment. The Court rejected the state's arguments that a detention at the investigatory stage did not require probable cause as a misconception of "the purposes of the Fourth Amendment." *Davis*, 394 U.S. at 726, 89 S.Ct. 1394.

**64.** Under Pennsylvania law, the same standard is applied. *See Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975, 980 (1982) (holding that a transportation of suspects from place of initial investigatory stop without exigent circumstances to support that action is an arrest requiring showing of probable cause). It should be noted, however, that merely placing a suspect in a police vehicle and transporting that suspect a brief distance does not necessarily trigger the protections afforded in a traditional arrest. For example, in *Commonwealth v. Revere*, 585 Pa. 262, 888 A.2d 694, 696 (2005), the Pennsylvania Supreme Court held that "where exigent circumstances exist, a brief detention and transportation in a police vehicle does not constitute an arrest which must be supported by probable cause." There, the police officers placed two suspects in the back of an unmarked patrol car without handcuffs and transported them a few blocks in order to help a fellow officer whom they believed to be in peril. *Id.* at 697. Immediately thereafter, the officers released the suspects from the patrol car and resumed the investigatory detention. *Id.* The court in *Revere*, however, was careful to distinguish the exigent circumstances presented by the facts of *Revere* from the facts in *Dunaway*, noting that officers in *Revere* transported the suspects only briefly and out of a concern for safety, and not to accommodate a station house interrogation. *Id.* at 708 n. 16.

cause to arrest. Inspector Tiano testified as follows:

Q ... If the police officer himself believes that he does not have probable cause to arrest a citizen, did the practices, policies and procedures of the Philadelphia Police Department as they existed back in February of 1998 permit a police officer to take such an individual against his will into custody and bring that person back to district headquarters, where there was a desire to investigate that individual, but as I said, not probable cause to cause his arrest?

A I believe probably yes.

Q Okay. And that's a practice, policy and procedure which had been going on for many years prior to February of 1998, is that correct?

A Yes.

\* \* \* \* \* \*

Q Well, at the time that these people were brought in involuntarily for investigation, there was no probable cause to arrest them at that point in time, is that correct?

A Yes.

Q Yet it would be the policy and practice of the Police Department because of their interest in the person to take that person into custody and bring them into the police station for questioning, correct?

A Yes, sir.

Trial Tr. 122:18–123:6, 124:4–12, Feb. 1, 2006.

■■■■ Inspector Tiano's testimony describes a custom of bringing suspects to the police station for questioning without probable cause to arrest, which is in clear contravention of the mandate set forth by the Supreme Court as early as 1979: investigatory detentions without probable cause to arrest violate an individual's Fourth Amendment right to be free from unreasonable seizures. Therefore, pursuant to *Dunaway* and *Hayes*, the City of Philadelphia violated Mr. Glass and Kareem's Fourth Amendment rights on February 10, 1998 when they were brought involuntarily to the police station in the back of a police car, handcuffed and placed in a cell for 2 to 3 hours for investigative purposes, without probable cause to arrest.

In addition, the City of Philadelphia violated Kareem's Fourth Amendment rights on August 31, 1998 when he was brought to the police station and placed in a cell to investigate whether he was driving a stolen car without probable cause to arrest.[65] The City is liable under § 1983 for employing an unconstitutional custom of investigatory detentions that caused injury to plaintiffs Mr. Glass and Kareem.

■■■ According to plaintiffs, the injury caused by the City's unconstitutional custom is not only the loss of freedom during the investigatory detentions, but also interference with the *Glass I* trial. Pls.' Prop. Findings ¶¶ 2463–64. Plaintiffs argue that the February 10, 1998 stop and detention of Mr. Glass and Kareem was meant to intimidate potential witnesses from testifying in *Glass I*. The Court disagrees.

There is no evidence that the February 10, 1998 stop and detention caused any witness to refrain from testifying at trial. Plaintiffs point to the testimony of Joseph

---

**65.** Officer Campbell could not recall at trial whether he handcuffed Kareem on August 31, 1998. Nor could he recall whether he was the officer who actually transported Kareem back to the Ninth District Police Station, but he testified at deposition that he transported Kareem. Officer Campbell did recall, however, that Kareem was placed in a cell room and held there until Ms. Malloy confirmed that the car was not stolen. Trial Tr. 60:12–18, 66:17–23, Feb. 23, 2006.

Russell in *Glass II* in support of their claim. However, Mr. Russell—the only eyewitness to both the alleged beating of Kareem in July 1995 and to the February 10, 1998 stop in front of the Glasses' house—appeared at the federal courthouse in May of 1998 prepared to testify on behalf of the plaintiffs.[66] Therefore, the plaintiffs have failed to prove the City's custom of investigatory detentions caused any interference with the trial is *Glass I* and that alleged interference cannot serve as a basis for damages attributable to the City's unconstitutional custom.

c. *Municipal liability for the inadequate investigation of citizens' complaints*

Finally, plaintiffs allege the City is liable because it employed an unconstitutional policy that resulted in the inadequate investigation of citizens' complaints. Plaintiffs' arguments focus on the IAD policy of sending "minor" verbal abuse and lack of service complaints back to the district captains for investigation.[67] According to plaintiffs, "the actual policy and custom of IAD was to send more serious complaints back to the District as a means of having those complaints treated less seriously than the allegations warranted." Pls.' Prop. Findings 2502. In so doing, according to plaintiffs, the "policy resulted in a lessening of the effectiveness and indepen-

dence of investigation of Citizen's Complaints." Pls.' Prop. Findings ¶ 2503.

Plaintiffs rely on *Beck v. Pittsburgh*, 89 F.3d 966 (3d Cir.1996), described above. There, the Third Circuit did not reach its own conclusion as to the propriety or inadequacy of the police policy, but rather determined that the evidence presented by the plaintiff was enough for a reasonable jury to find knowledge and acquiescence on the part of the police chief. Again, the plaintiff in *Beck* presented evidence—outside of the plaintiff's own testimony—as to the inadequacy of the policy at issue. Two key pieces of evidence were the testimony of the assistant chief of OPS (a civilian) that the policy at issue was deficient with regard to excessive force claims, and OPS's internal end-of-year report which recognized that excessive force was a problem.

*Beck* is distinguishable. Here, unlike in *Beck*, there is no evidence that IAD's policy of sending verbal abuse and lack of service complaints to the district captains for investigation was inadequate. As described above, the policy was instituted based on an examination of the "best practices" employed by other comparable police departments throughout the country. Trial Tr. 14:13, Feb. 15, 2006, vol. I. Plaintiffs did not offer any expert testimony as evidence to the contrary.[68]

---

**66.** Although Mr. Russell testified that he left the courthouse during the trial in *Glass I*, it was the result of being told Kareem was going to be arrested during trial. Mr. Russell did not leave as a result of the February 10, 1998 incident.

**67.** The IAD policy at issue is contained in Police Directive 127, which states:

The investigative responsibility and accountability for the handling of selected verbal abuse and lack of service complaints will lie with the pertinent district/unit commanding officer, upon approval of the Commanding Officer, IAD. Responsibility for an

investigation assigned to a district/unit commanding officer will not be delegated to subordinate personnel.

Pls.' Ex. 52A (Philadelphia Police Dept., Directive 127(I)(D), *Complaints Against Police* (Sept. 28, 1994)).

**68.** The court in *Beck* determined that expert testimony was not necessary because an employee of OPS testified that its system of review was deficient. In addition, the employee produced an internal report outlining certain deficiencies in the investigative system that needed to be corrected. Here, there was no such evidence from any employee of IAD or

Moreover, the policy of sending minor complaints back to the districts for investigation is consistent with the well-settled principle of a chain-of-command structure,[69] where, as Deputy Commissioner Norris testified, supervisors "are supposed to train, counsel and discipline their own officers." Trial Tr. 33:2–5, Feb. 15, 2006, vol. I.

▮▮▮ Plaintiffs have failed to show that the City of Philadelphia Police Department's policy of sending verbal abuse and lack of service complaints to the district captains for investigation warrants liability pursuant to § 1983.[70] Therefore, the City is not liable under § 1983 for inadequately investigating citizens' complaints.

### 2. *Liability of the individual officers under § 1983*

▮▮▮ In addition to the allegations of municipal liability, plaintiffs allege the Ninth District officers named as individual defendants are liable under § 1983 for violating several of their constitutional rights. Specifically, plaintiffs allege the officers: (1) engaged in a civil conspiracy to interfere with the trial of *Glass I;* (2) engaged in abuse of process by attempting to serve

an arrest warrant in order to interfere with the trial of *Glass I;* and (3) employed excessive force, engaged in a warrantless search and arrested Mr. Glass and Kareem without probable cause during the February 10, 1998 stop and arrested Kareem without probable cause on August 31, 1998. In addition, plaintiffs allege (4) supervisory liability under § 1983 as to Sergeant Craighead, Lieutenant Lampe, Captain Ditchkofsky and Inspector Tiano for failure to prevent or address the conduct of their subordinates. The Court will address each alleged constitutional violation that plaintiffs assert as a basis for individual liability pursuant to § 1983.[71]

#### a. *Abuse of process*

Plaintiffs allege that Detective Brennan and Lieutenant Lampe engaged in an abuse of process during the *Glass I* trial when a warrant was issued for Kareem's arrest in the Bohannon case.

▮▮▮ "A section 1983 claim for abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by law." *Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir.1989); *see also Tarlecki v. Mercy*

---

the Police Department, therefore expert testimony regarding the adequacy of IAD policies and procedures was needed. *Beck*, 89 F.3d at 968–69.

**69.** Plaintiffs argued at trial that it was a conflict of interest for supervisors to investigate citizens' complaints against officers under their command. There was no evidence to support this statement, which is contrary to the chain-of-command organizational structure universally employed by the military, police departments and the private sector.

**70.** In fact, one of plaintiffs' complaints against the police was sustained as the result of an IAD investigation. Moreover, Mr. Glass repeatedly requested that IAD investigate his complaints rather than Captain Ditchkofsky of the Ninth District. However, even when IAD was conducting the investigation, Mr.

Glass failed to cooperate with the investigating officer and some of his complaints were dismissed for lack of cooperation. Finally, IAD investigated Mr. Glass's complaints of harassment by Ninth District officers, which included a detailed summary of several complaints Mr. Glass had filed at the time in question.

**71.** Qualified immunity is an affirmative defense. Although defendants belatedly injected qualified immunity into their proposed findings of facts and conclusions of law submitted after the trial, it was not pleaded as an affirmative defense in their answer to plaintiffs' complaint. Accordingly, not having argued it for nearly 10 years, the defense is waived. Am. Answer (doc. no. 95).

*Fitzgerald Hosp.*, 2002 WL 1565568, **4–5, 2002 U.S. Dist. LEXIS 12937, at *14 (E.D.Pa. July 15, 2002) (Robreno, J.). A claim for abuse of process exists when process is used to effect "an extortionate demand, or to cause the surrender of a legal right, or is used in any other way not so intended by proper use of the process." *Id.*, 2002 WL 1565568, **4–5, 2002 U.S. Dist. LEXIS 12937, at *14 (quoting *Bristow v. Clevenger*, 80 F.Supp.2d 421, 431 (E.D.Pa.2000)).

In *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir.1977), the Third Circuit discussed the tort of abuse of process. There, the plaintiff was the target of a grand jury investigation spearheaded by the defendant, who was an appointed assistant special prosecutor. The defendant devised a scheme, in conjunction with the district attorney and a police officer, to charge the plaintiff with solicitation to commit burglary. Then, during the grand jury investigation, the defendant attempted to extort $150,000 from the plaintiff to "take care of" the plaintiff at the grand jury proceedings. *Id.* at 1216. The Third Circuit opined: "[i]f the defendant has process issued based on the truthful statement that the plaintiff solicited burglary and then uses the threat of prosecution for purposes of extortion, this is malicious abuse [of process]." [72] *Id.* at 1219. The Third Circuit in *Jennings* stated that "the use to which process is put can either be legitimate or illegitimate, and, if illegiti-

mate, there is malicious abuse." *Id.* at 1219.

Here, plaintiffs allege that Detective Brennan and Lieutenant Lampe abused process by using the arrest warrant in the Bohannon case to interfere with the trial in *Glass I.* In support of their claims, plaintiffs highlight the fact that Detective Brennan held the warrant from April 26, 1998, when the ADA approved the affidavit, until late on May 6, 1998, when the bail commissioner signed the warrant. [73] Rather than having the bail commissioner approve the warrant before the trial began or waiting until the trial was over, Detective Brennan obtained the warrant during the trial after receiving a phone call from an unidentified officer informing Detective Brennan that Kareem was in federal court. These factors, according to plaintiffs, demonstrate that Detective Brennan used the warrant to interfere with the trial.

First, as discussed above, there is insufficient evidence to demonstrate that Lieutenant Lampe was the officer who called Detective Brennan or that Lieutenant Lampe even played a role in obtaining the arrest warrant in the Bohannon case. That plaintiffs surmise that the phone call to Detective Brennan must have been made by Lieutenant Lampe does not make it so. Therefore, Lieutenant Lampe is not liable for abuse of process.

Second, plaintiffs' theory for liability requires the Court to assume as a fact that

---

72. It is important to note the procedural posture of *Jennings.* The Third Circuit's opinion reversed the district court's grant of the defendants' motion to dismiss. The Third Circuit distinguished between malicious use of process and malicious abuse of process, which were subject to different statutes of limitation. In so doing, the court had to determine whether the facts as alleged included a claim for both malicious use and abuse of process, the former being barred by the statute of limitations. Therefore, the court

did not determine whether there was actually an abuse of process, but rather only whether the plaintiff alleged facts sufficient to survive a motion to dismiss.

73. There was confusing testimony as to whether a detective has the authority to arrest when the ADA approves the affidavit of probable cause, but before the actual warrant is sworn and signed by an issuing authority, such as the bail commissioner or a judge.

Detective Brennan was the unknown detective who telephoned Ms. Smith on May 6, 1998 and precipitated her announcement to the Court that a detective was "on his way" to arrest Kareem. Again, that plaintiffs speculate that the call to Ms. Smith during trial must have been made by Detective Brennan does not make it so.

Third, Detective Brennan never served the warrant, which is the process that forms the basis of the claim; nor have plaintiffs demonstrated that the trial was interrupted by any action of Detective Brennan.

█ Based on the facts before the Court, plaintiffs fall short of proving that Detective Brennan engaged in an abuse of process. Obtaining the warrant on the night of May 6, 1998 did not interfere with the trial. Therefore, Detective Brennan is not liable for abuse of process in violation of § 1983.

b. *Excessive force, warrantless search and arrest without probable cause*

Plaintiffs also allege that defendants violated their Fourth Amendment rights by using excessive force, engaging in a warrantless search and arresting Mr. Glass and Kareem without probable cause. These allegations are based upon the February 10, 1998 incident in front of the Glass home. Plaintiffs also allege a lack of probable cause for the August 31, 1998 arrest of Kareem. Primarily, plaintiffs' allegations implicate Officers Vales and Rockeymore in the February 10, 1998 incident. However, plaintiffs also allege liability on the part of Officers Marcus and McKenny and Lieutenant Lampe, who allegedly were also present at the February 10, 1998 stop based upon the conspiracy claim. As discussed below, plaintiffs have failed to prove the existence of a conspiracy. Therefore the Court will address the instant claims, including excessive force,

warrantless search and arrest without probable cause as to Officers Vales and Rockeymore. In addition, the Court will consider the conduct of Officers Gill and Campbell for the August 31, 1998 arrest of Kareem with plaintiffs' allegations of arrest without probable cause.

i. Excessive force

Specifically, plaintiffs argue that Officers Vales and Rockeymore employed excessive force when they allegedly placed their guns to Mr. Glass and Kareem's heads and used obscene language during the February 10, 1998 stop.

█ A claim of excessive force is analyzed under the Fourth Amendment objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To determine whether a seizure during an arrest or investigatory stop is reasonable, the Court must assess the facts and circumstances of the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. Therefore, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and the circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. In applying the objective reasonableness standard, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is unreasonable under the Fourth Amendment. *Id.* at 396, 109 S.Ct. 1865.

In *Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir.1997), the Third Circuit found that officers who shouted obscenities at suspects and pointed their weapons at the

suspects did not use excessive force. There, a woman called 911 to report that her estranged husband had struck her in the head with a gun while two of his friends held her down. Officers arrived at the woman's apartment, saw her injuries and sent her to the hospital. Officers then went to the husband's residence and confirmed with a neighbor that he was home, and the police assembled the SWAT team from a makeshift command post nearby. *Id.* at 815–16. Officers ordered the men out of the house; the men complied and were told to lie face down in the dirt. At that time, the officers had guns pointed at their heads, *id.* at 816, and threatened that if the men moved, the officers "would blow [their] ... fucking heads off." *Id.* at 821.

As the Third Circuit explained, "it is incontestable that the display of force used to apprehend the four men for an alleged domestic assault, albeit with a gun, appears extreme." *Id.* at 821. The court went on: "It does not follow, however, that the extreme methods used in effecting the four arrests, such as requiring plaintiffs to lie face down in the dirt with guns to their heads and vulgar threats, were constitutionally excessive, even through they caused plaintiffs' discomfort and humiliation." *Id.* The Third Circuit focused on *Graham*'s totality of the circumstances requirement to uphold the district court's grant of summary judgment in favor of the defendant police officers. *Id.* at 822.

The specific facts and circumstances of the February 10, 1998 stop at issue are as follows. Officer Vales had heard a call over police radio two nights prior about a black Acura that was fleeing an officer in the adjacent Sixth District. That night, Officer Vales had prepared to engage in the pursuit as back-up before it was stopped. Two nights later, February 10, 1998, Officer Vales recognized a black Acura matching the description that he had heard over the radio and from the vehicle's tag. Officer Vales immediately called in the tag over the police radio, and the tag on the black Acura came back as belonging to a Fiat model car. Although Officers Vales and Rockeymore did not observe the occupants of the black Acura engaging in any illegal activity, they believed it was the same car that had fled from Officer Auman two nights prior and police radio confirmed that the car's tags were not valid. The officers conducted the stop armed with this information.

First, Officers Vales and Rockeymore's conduct was consistent with *Graham*. One, the severity of the crime at issue was unknown, and assumed to be felonious. Two, the suspects were assumed to pose an immediate threat to the safety of the officers or others until they were patted down for weapons and handcuffed. Three, although Mr. Glass and Kareem were not actively resisting arrest or attempting to evade arrest by flight, they ignored the officers initial attempt to stop the vehicle. Therefore, the officers did not use excessive force in effectuating the car stop on February 10, 1998.[74]

Second, the officers acted reasonably under the circumstances, which are similar to *Sharrar*.[75] Here, as in *Sharrar*, Officers Vales and Rockeymore did not know whether Mr. Glass and Kareem were armed or whether they posed a threat to

---

74. This does not include a determination as to the detention and transportation of Mr. Glass and Kareem once ownership of the vehicle was confirmed. That conduct is the subject of plaintiffs' later allegation of arrest without probable cause.

75. That *Sharrar* involved a lawful arrest and the circumstances at issue involve a *Terry* stop does not affect the analysis. Both are governed by the Fourth Amendment objective reasonableness standard.

the officers' safety. Although Mr. Glass and Kareem were admittedly not engaged in any illegal activity at the time of the stop, the officers testified that they "had no idea what these guys had done" because of the alleged flight from police two nights prior. Trial Tr. 194:1–2, Feb. 2, 2006. Similar to *Sharrar*, the circumstances, en toto, do not suggest excessive force in violation of the Constitution, although the actions may have "come close to the line." *Sharrar*, 128 F.3d at 822.

Moreover, *Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir.1995), is unhelpful to plaintiffs. In *Baker*, the Third Circuit found that officers' use of handcuffs and guns on a family who was approaching a home at which the officers were conducting a drug raid constituted excessive force in violation of the Fourth Amendment. There, officers had obtained a no-knock warrant to conduct a surprise raid on a suspected drug house. As the officers charged the house to serve the warrant, plaintiffs— a mother, her son and two daughters—were approaching the house and had begun to knock on the door. The officers shouted at the plaintiffs to "get down," "pointed guns at them, handcuffed them" and searched the son. *Id.* at 1188–89. After the plaintiffs identified themselves as relatives of the homeowner, they were released. *Id.* The court determined that shouting at the plaintiffs to "get down" until the officers secured the home was entirely reasonable given that they were serving a no-knock warrant on a drug house. *Id.* at 1191–92. However, the officers' use of guns and handcuffs was "a very substantial invasion of the Bakers' personal security, ... without any reason to feel threatened by the Bakers, or to fear the Bakers would escape." *Id.* at 1193. The court determined that the plaintiffs' testimony would support a finding of excessive force in violation of plaintiffs'

Fourth Amendment rights. *Id.* (deciding a motion for summary judgment).

*Baker* is distinguishable from the facts at issue. There, the officers had no reason to believe that the Bakers were involved in any illegal activity other than their presence at the location of a home upon which a warrant was being served. Nevertheless, they exposed the plaintiffs to jeopardy by using guns and handcuffing them. Unlike the officers in *Baker*, who had no information that the plaintiffs were involved in criminal activity, Officers Vales and Rockeymore had reason to believe Mr. Glass and Kareem were involved in a crime by virtue of the alleged flight from police.

Therefore, Officers Vales and Rockeymore are not liable under § 1983 for the February 10, 1998 stop because the officers did not employ excessive force in effectuating the stop.

ii. Warrantless search

According to plaintiffs, police officers on the scene of the February 10, 1998 stop engaged in a warrantless search of Mr. Glass's black Acura. Plaintiffs allege that on February 10, 1998 "other officers, including Marcus and McKenny, began to arrive[;] they opened the doors, trunk and hood of [the] Glass vehicle and began looking everywhere throughout the car." Pls.' Prop. Findings ¶ 1756 (citing testimony of Mr. Glass). Officer Vales testified that he saw other officers from "Major Crimes" look under the hood of the car to retrieve the VIN number. Trial Tr. 52:20–53:7, Feb. 13, 2006. There was no other testimony presented as to which specific officers conducted a search of the vehicle.

It is undisputed that the officers did not have a warrant to search the car. Therefore, the Court first must determine whether there was a reasonable suspicion to stop the car, and second, whether the

vehicle stop created any probable cause to search in the absence of a warrant.

■■■ In *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established that officers may stop a person based upon an articulable reasonable suspicion that a crime is afoot. Reasonable suspicion constitutes less than probable cause. The Supreme Court has held that the Fourth Amendment permits an officer who "lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, [to] detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). However, the *Terry* "stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Id.* (quoting *Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. 2574). The reasonable suspicion standard set forth in *Terry* applies in the context of traffic stops, where an officer is permitted to detain the vehicle and its occupants for a brief time without probable cause. *See United States v. Salvador Delfin–Colina,* 2006 WL 2708496 at *10 (3d Cir. Sept.22 2006) (holding that "the *Terry* reasonable suspicion standard applies to routine traffic stops."); *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138; *see also United States v. Holyfield,* 2005 WL 2106624, *3, 2005 U.S. Dist. LEXIS 35923, *9 (E.D.Pa. Aug. 26, 2005) (citing *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138). Unless the officer obtains probable cause to arrest or to perform a search during the course of the stop, the person is free to leave. *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138.

■■■ Probable cause to conduct a search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "[A] warrantless search of a car is valid if based on probable cause." *Id.* at 693, 116 S.Ct. 1657 (citing *California v. Acevedo,* 500 U.S. 565, 569–70, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)).

■■■ Here, the stop of the Glasses' vehicle was lawful, but the ensuing search of the vehicle was not. First, as to the stop, Officers Vales and Rockeymore had a reasonable suspicion to stop the Glasses' car because police radio confirmed that the tag displayed on the black Acura belonged to a Fiat model car. Moreover, Officer Vales recalled that the car matched the description of a car that had fled from another officer two nights prior.[76] The

---

**76.** Officer Vales testified that fleeing a police officer, in February 1998, would have been a "misdemeanor 2," which only confers authority to arrest if it is an "on-sight" misdemeanor. Trial Tr. 28:21–29:15, Feb. 13, 2006. No other evidence on this point was presented to the Court.

There is the separate issue of whether the discovery of false tags on a vehicle, the traffic violation at issue, conferred probable cause to arrest. If so, the search would have been lawful as incident to a lawful arrest. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860,

69 L.Ed.2d 768 (1981). Under Pennsylvania law, authority to arrest without warrant pursuant to a traffic violation is as follows:

(a) A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of this title in the presence of the police officer making the arrest; (b) Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of this title in the presence of the police officer in making the arrest.

*Terry* reasonable suspicion standard applies to routine traffic stops.

█ Second, as to the search under the hood of the black Acura to obtain the VIN number, the officers lacked probable cause for the search. During the lawful stop, the officers had a reasonable suspicion to detain Mr. Glass and Kareem at the scene for a reasonable amount of time commensurate in scope with the suspected illegal activity, which included the suspected flight two nights prior and the traffic violation. Once the stop was effectuated and Mr. Glass and Kareem were handcuffed and under the officers' control, the officers had several options, none of which included the authority to search the vehicle without a warrant. As to the suspicion of flight, the officers could have briefly detained Mr. Glass and Kareem to investigate the flight until Officer Auman, the Sixth District officer who actually pursued the fleeing black Acura, came to the scene to identify the car or its occupants. The police directives permit an officer to follow this procedure of identification. Pls.' Ex. 52 (Police Directive 58.II.B.).

As to the traffic violation—having improper tags affixed to the vehicle—the officers could have (a) asked Mr. Glass and Kareem to produce the registration, proof of insurance, the VIN or a driver's license, which the officers admittedly did not do;[77] (b) immobilized the black Acura and had it towed and stored at a facility based upon the lack of registration;[78] or (c) asked Mr. Glass and/or Kareem to consent to a search of the vehicle.[79] The officers did

75 Pa. Cons.Stat. § 6304 (2006). As no members of the state police were involved in the February 10, 1998 stop and Mr. Glass and Kareem are not "nonresident[s]," the officers were not permitted to arrest Mr. Glass or Kareem solely based upon the traffic violation. Therefore, the search would not be incident to a lawful arrest for the traffic violation.

77. Under Pennsylvania law:

Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa. Cons.Stat. § 308(b) (2006). Therefore, the officers could have asked Mr. Glass and Kareem to produce the VIN, rather than looking under the hood of the car to obtain the VIN.

78. Pennsylvania law permits officers to immobilize, tow and store a vehicle without a valid registration:

If a motor vehicle or combination for which there is no valid registration or for which the registration is suspended, as verified by an appropriate law enforcement officer, is operated on a highway or trafficway of this Commonwealth, the law enforcement officer shall immobilize the motor vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storing agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified.

75 Pa. Cons.Stat. § 6309.2 (2006). This procedure would have preserved the vehicle and its contents to allow the officers to obtain a search warrant if they had probable cause to believe the car was stolen.

79. Mr. Glass testified that he told the officers "I've got a driver's license in my car. I've got papers in the car." Trial Tr. 37:21–37:23, Feb. 18, 2006; Pls.' Prop. Findings ¶ 1756. That raises the issue of whether, through that statement, Mr. Glass consented to a search or simply invited officers to ask Mr. Glass for permission to retrieve the paperwork. "A voluntarily given consent is an exception to the warrant requirement and is therefore constitutionally permissible." *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir.1989) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Whether consent was voluntary is based on the totality of the circumstances, the impor-

not have probable cause to search under the hood, nor did they have probable cause to arrest Mr. Glass or Kareem. Therefore, the officers violated Mr. Glass and Kareem's Fourth Amendment right to free from unreasonable searches when the officers looked under the hood of the car.

█ Although plaintiffs have shown a violation was committed, they have failed to show by a preponderance of the evidence the identity of the specific officers who conducted the search under the hood to retrieve the VIN. Mr. Glass testified that he saw Officers Marcus and McKenny looking under the hood of his car. Officer Vales testified that officers from "Major Crimes" who had arrived at the scene actually retrieved the VIN number, and not he or Officer Rockeymore. The testimony of both Mr. Glass and Officer Vales lacks specificity. Moreover, given the rapidly moving events on the scene of the stop and the fact that it was dark, it is doubtful that the witnesses were in a position to observe the search clearly. Under these circumstances, the Court will discount both of their testimony. Therefore, while in theory there is a constitutional violation resulting from the officers' unlawful search, there can be no liability grounded in § 1983 because there is insufficient evidence as to the identity of the officer or officers who conducted the unlawful search.

### iii. Arrest without probable cause

Plaintiffs allege that Officers Vales and Rockeymore are liable for violating their Fourth Amendment rights by arresting Mr. Glass and Kareem without probable cause. Although the officers testified that they thought they lacked probable cause to arrest Mr. Glass and Kareem during the February 10, 1998 stop, the Fourth Amendment reasonable inquiry is objective, without consideration of the officers' subjective intentions. In addition, plaintiffs allege that Officer Campbell arrested Kareem without probable cause on August 31, 1998.

█ Plaintiffs' claims have merit. As discussed in detail above, the officers initiated the February 10, 1998 stop of Mr. Glass and Kareem based upon a reasonable suspicion. The reasonable suspicion as to the improper tags ended once the police radio confirmed that the VIN identified Mr. Glass as the car's owner. As to the flight from police two nights prior, the officers' reasonable suspicion had not ripened into full-blown probable cause during the detention of Mr. Glass and Kareem at the scene of the stop. At that point, as noted above, the officers needed Officer Auman to positively identify Mr. Glass and Kareem at the scene to create probable cause to arrest, or the men should have been free to go. There was no probable cause to arrest Mr. Glass and Kareem pursuant to the traffic violation observed on February 10, 1998. Moreover, and also as explained in detail above, police officers may not bring citizens to the police station against their will for investigative purposes

tant factors of which are age, education or "low intelligence," lack of any advice as to one's constitutional rights, repeated and prolonged questioning, and the use of physical punishment. *Id.* at 1081–82 (citing *Schneckloth*, 412 U.S. at 226–27, 93 S.Ct. 2041). Moreover, the fact that consent is obtained during the course of an investigative traffic stop does not impact the ability to consent. *Id.* at 1082. Here, there is not enough evidence to determine whether Mr. Glass consented to the search under the hood of the car *to obtain the VIN, although he certainly invit*ed to officers to request his consent or to permit Mr. Glass himself to enter the vehicle to retrieve the paperwork. Moreover, even if Mr. Glass's words had been deemed a valid consent to search, the instruction was that paperwork and a driver's license were inside the vehicle and not under its hood.

without probable cause to arrest. *See Hayes,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705; *Dunaway,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824. To do so is a seizure in violation of the Fourth Amendment. Therefore, Officers Vales and Rockeymore are liable under § 1983 for violating Mr. Glass and Kareem's Fourth Amendment right to be free from unreasonable seizure.[80]

■ On August 31, 1998, Officer Campbell conducted a vehicle stop of a car driven by Kareem pursuant to a traffic violation. Officer Campbell suspected the vehicle, which was registered to Ms. Malloy, might be stolen. Officer Campbell took Kareem, without his consent, to the Ninth District and placed him in a cell for investigation as to whether the vehicle was stolen. This constituted a seizure under the Fourth Amendment. Officer Campbell did not have probable cause to arrest Kareem. Therefore, Officer Campbell also is

liable for the August 31, 1998 arrest of Kareem without probable cause.[81]

### c. Civil conspiracy

■ Plaintiffs allege that all of the named defendants participated in a civil conspiracy to deprive the Glasses of their civil rights in violation of § 1983. To prove a civil conspiracy under § 1983, plaintiffs must demonstrate (1) an agreement of two or more conspirators (2) to deprive the plaintiffs of a constitutional right, (3) under color of state law. *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 700 (3d Cir.1993) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), *abrogated on other grounds by UA Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 400 (3d Cir.2003). Plaintiffs point to the contacts listed below between the Glasses and the defendants as evidence of this conspiracy [82]:

---

**80.** Even if qualified immunity were an available defense, it would not cloak the individual defendants from liability. In *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), the Supreme Court described that the defense of qualified immunity is unavailable when: (1) the constitutional right at issue is clearly established and (2) a reasonable officer would have known his or her conduct violated that right. Here, the constitutional right at issue was clearly established and a reasonable officer would have known his or her conduct was unconstitutional.

**81.** As to the four arrests of Kareem pursuant to the FTA warrant in the Bohannon case, there is no liability because the officers had probable cause for each arrest. Each of the four stops was precipitated by a traffic violation, which created a reasonable suspicion for the stop. The existence of the FTA warrant in the Police Department's computer system gave the officers probable cause to arrest Kareem. As discussed above, plaintiffs did not show that the FTA warrant was introduced into the system as part of the alleged conspiracy to violate the Glasses' civil rights.

**82.** Plaintiffs recount a litany of conduct by members of the Philadelphia Police Department toward the Glasses from approximately August 1997 through 1999, at which time they commenced the instant action, to support the allegation of a civil conspiracy under § 1983. According to plaintiffs, each of the contacts described, both in narrative and list form in the Court's findings of fact, were part of the officers' conspiracy against the Glasses. The Court need not recount each incident.

In summary, plaintiffs offered the following evidence as proof of a civil conspiracy: (1) the testimony of Joseph Russell that he observed Officers Marcus and McKenny shining lights into the Glass home, which contributed to his decision not to testify at trial, Pls.' Prop. Findings ¶ 1695; (2) Mr. Glass's testimony that Lieutenant Lampe mishandled the Glasses' complaint, IAD 98–04, in cohort with Officers Marcus and McKenny, Pls.' Prop. Findings ¶ 1698; (3) the tape of the police radio transmission on the night of the February 10, 1998 incident, which purportedly shows that Officer Marcus used police radio in an attempt to contact Lieutenant Lampe, Pls.' Prop. Findings ¶ 1703; (4) the February 10,

1. August 1997, activity in the vacant lot across from the Glass home begins.

2. January 1, 1998, Kareem is arrested by Officers Marcus and McKenny for possession of marijuana. Mr. Glass files a complaint and claims that his statements to Lieutenant Lampe and Sergeant Craighead, who are investigating the complaint, are incorrectly recorded.

3. February 10, 1998, Mr. Glass and Kareem are arrested by Officers Vales and Rockeymore. On February 12, 1998, Mr. Glass and Ms. Malloy attend a meeting at the Ninth District to address the February 10, 1998 incident.

4. May 6, 1998, the trial of *Glass I* is interrupted with news that Kareem is going to be arrested for the Derek Bohannon assault charge. Kareem surrenders himself on May 7, 1998 at the Central Detectives division.

5. August 31, 1998, Kareem is arrested while driving Ms. Malloy's car.

6. September 16, 1998, Officer McKenny follows Mr. Glass and Kareem home after a preliminary hearing for the Bohannon case. McKenny allegedly tells Kareem "I'm going to fuck you up."

7. November 22, 1998, Kareem is arrested pursuant to an FTA bench warrant in the Bohannon case.

8. December 22, 1998, Kareem is arrested for the second time pursuant to

1998 stop of Mr. Glass and Kareem, which occurred within hours of Mr. Glass and Ms. Malloy leaving the Ninth District to complain about the statements prepared by Lieutenant Lampe and within a few minutes of the initial stop, several other Ninth District officers arrived, some of whom were allegedly "high-fiving" and saying "Lieutenant Lampe was going to be happy" according to the testimony of Mr. Glass, Ms. Malloy, Mr. Russell and Mr. Snead, Pls.' Prop. Findings ¶¶ 1863–65; (5) Ms. Malloy's testimony that Officer Campbell tried to force her to admit that Kareem stole her car on August 31, 1998, Pls.' Prop. Findings ¶ 2068; (6) the allegation, sustained by an IAD investigation, that two police officers announced Kareem's arrest over the loudspeaker in front of the Glass home, Pls.' Prop. Findings ¶ 2069; and (7) plaintiffs' allegations that Inspector Tiano and Captain Ditchkofsky "enabled the [officers'] conduct by actively subverting the inve[s]tigation into the allegations thereby aiding and abetting the officers under their command." Pls.' Prop. Findings ¶ 2382.

Plaintiffs point to the actions of Detective Brennan in obtaining a warrant for Kareem's arrest during *Glass I* as the culmination of the officers' conspiracy to interfere with the trial. Pls.' Prop. Findings ¶ 1988. Plaintiffs recount Detective Brennan's testimony that he received a telephone call from an unidentified officer informing him that Kareem was in federal court if the detective wanted to arrest Kareem. Plaintiffs argue that Lieutenant Lampe must have made that telephone call.

Pls.' Prop. Findings ¶ 1925. In addition, plaintiffs allege that Lieutenant Lampe began his role in the conspiracy against the Glass family in February 1998 when he was assigned to investigate Mr. Glass's complaint, IAD 98–04, and take Mr. Glass's statement during that investigation. Moreover, plaintiffs claim Lieutenant Lampe was present at the February 10, 1998 stop and he orchestrated the stop shortly after Mr. Glass and Ms. Malloy left the Ninth District police station. Pls.' Prop. Findings ¶ 2183–84. Further, plaintiffs implicate Sergeant Craighead in the conspiracy for his role in interviewing Mr. Glass and preparing the statements at the direction of Lieutenant Lampe. Pls.' Prop. Findings at ¶ 2160–61.

At trial, plaintiffs painted a picture of the physical layout of the Ninth District headquarters as being conducive to informal sharing of information among officers about pending lawsuits and court appearances. Plaintiffs generally pointed to the professional and social relationships of Ninth District officers as evidence of the feasibility of a civil conspiracy among them. Overall, plaintiffs asserted that the defendant officers had ample opportunity and access to information regarding the *Glass I* lawsuit and the Glasses' complaints, which were often sent to the Ninth District for investigation. According to plaintiffs, the officers had the opportunity to obtain knowledge and confer about the *Glass I* lawsuit, and to agree to interfere with that trial and harass the Glasses.

9

an FTA bench warrant in the Bohannon case.

9. December 30, 1998, Kareem is arrested for the third time pursuant to an FTA bench warrant in the Bohannon case.

10. January 13, 1999, Kareem is arrested for the fourth time pursuant to an FTA bench warrant in the Bohannon case.

11. January 13, 1999, two officers drive past the Glass house and announce on the loudspeaker "we just arrested Kareem Glass."

12. January 12, 1999, Mr. Glass files a citizen's complaint against Inspector Tiano and Captain Ditchkofsky alleging a pattern of harassment, which included a threat allegedly made by Captain

Ditchkofsky to have Mr. Glass investigated for his dealings with the PPA.

Plaintiffs' civil conspiracy claim fails because: (1) they failed to show that, except on the February 10, 1998, arrest of Mr. Glass and Kareem without probable cause and on the August 31, 1998, arrest of Kareem without probable cause, there were any other constitutional violations;[83] and (2) they failed to show the existence of a common design or purpose as to the two violations by defendants.

 Unlike in the criminal conspiracy context, where the crime lies in the agreement itself,[84] a cause of action for civil conspiracy requires a distinct underlying tort as a predicate to liability.[85] *In re*

83. Despite the fact that there is no finding of individual § 1983 liability for the warrantless search of the VIN on Mr. Glass's vehicle, arguably the same analysis would apply when considering that action as an "underlying tort" to determine the existence of a civil conspiracy. The warrantless search may very well "constitute a valid cause of action if committed by one actor." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir.1999) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1218 (11th Cir. 1999)). In this case, however, there was no individualized § 1983 liability because plaintiffs offered no evidence with respect to which officer(s) conducted that search. Even if this action could constitute the predicate underlying tort in the civil conspiracy context, plaintiffs would nevertheless fail on the § 1983 civil conspiracy claim as they are unable to show the requisite agreement. See accompanying text for discussion.

Furthermore, although the Glasses' other contacts with police, i.e. shining police lights into the Glass home, do not constitute separate underlying torts such that they warrant a civil conspiracy analysis in the first instance, even if, arguendo, the Court were to accept them as underlying torts, there would nonetheless be no finding of a civil conspiracy in this case absent an agreement between the officers to violate the Glasses' constitutional rights.

84. *See Gregory v. Chehi*, 843 F.2d 111, 118 (3d Cir.1988) (noting that criminal conspiracy may be an offense though its purpose is not achieved); *United States v. Kates*, 508 F.2d 308, 310 (3d Cir.1975) ("[I]t is well established that the 'gist' of conspiracy is an agreement.").

85. It appears that under Pennsylvania law, there may be instances where a civil conspiracy claim may be independently actionable without the existence of a separate underlying tort. *Franklin Music Co. v. Am. Broad. Co., Inc.*, 616 F.2d 528, 548 (3rd Cir.1979). In Pennsylvania jurisprudence, a civil conspiracy is defined as "a combination between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, or to accomplish an unlawful purpose." *Id.* at 534. As explained by Judge Sloviter in *Franklin Music Co.*, this definition actually encompasses two separate and independent grounds for liability, each evolving out of a "distinct strain" of reasoning. *Id.* at 548. "Conspiracy to commit an unlawful act" is derived from the view that the "conspiracy d[oes] not exist at all as an independent tort." *Id.* "Combination to do a lawful act by unlawful means", on the other hand, stems from a contrary line of authority holding that the conspiracy itself was an independent tort. *Id.* at 549. While these two theories seem diametrically opposed, Judge Sloviter notes that "the modern

*Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir.1999); *Pardue v. Gray*, 136 Fed.Appx. 529, 533 (3d Cir.2005); *see also Gregory v. Chehi*, 843 F.2d 111, 118 (3d Cir.1988) ("In contrast, a civil conspiracy is not actionable unless it causes legal harm."); *Lewis Invisible Stitch Mach. Co. v. Columbia Blindstitch Mach. Mfg. Corp.*, 80 F.2d 862, 864 (2d Cir.1936) (Hand, J.) ("Whatever may be the rule in criminal conspiracies, it is well settled that the civil liability does not depend upon the confederation ..., but upon the acts committed in realization of the common purpose."). *See generally* Thomas J. Leach, *Civil Conspiracy: What's the Use?*, 54 U. Miami L.Rev. 1, 9 (1999) (giving historic overview of civil conspiracy tort). "Thus, one cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant." *Orthopedic Bone*, 193 F.3d at 789.

The purpose of a civil conspiracy is not to impose liability for the commission of specific torts; rather, it is useful as a way of allocating liability to those persons who agreed to the common purpose but may not have actively participated in the commission of the underlying tort. *See* Leach, *supra*, at 11. For a civil conspiracy to be actionable, it must be "based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." *Id.* (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1218 (11th Cir.1999)). Therefore, a claim of civil conspiracy in this case can lie only as to the February 10, 1998, and August 31, 1998, arrests without probable cause and as to no other acts by defendants.

 Even as to the incidents of February 10, 1998 and August 31, 1998, nonetheless there can be no finding of civil conspiracy liability in this case. Despite the litany of contacts between the Glass family and members of the Philadelphia Police Department that spanned a number of years, there is insufficient evidence from which the Court can infer that the officers acted in concert or pursuant to a common plan or design to arrest Kareem on two occasions, and Mr. Glass on one occasion, without probable cause (or to unlawfully search the VIN on Mr. Glass's vehicle). Most generously to plaintiffs, what this evidence may show is independent conduct by different officers which caused similar harm to plaintiffs, i.e. arrests without probable cause. Although independent conduct may subject the officers to individual liability, in the absence of an agreement, it does not amount to a conspiracy.

Further, the named superior officers cannot be held liable because they in no way participated in or failed to prevent the February 10, 1998 and August 31, 1998 arrests without probable cause. With perhaps the exception of Inspector Tiano, who received a telephone call in the midst of the February 10, 1998 incident from a non-police source, plaintiffs have not shown that any superior officers had knowledge of the stop prior to or contemporaneous with the stop. Sergeant Craighead was not present at the scene of, nor did he participate in or have pre-incident knowledge of, the February 10 or August 31, 1998 incidents. Although there is conflicting testimony as to whether Lieutenant Lampe was or was not on the scene of the February 10, 1998 incident, there is no evidence that he directed or participated

Pennsylvania tort of civil conspiracy is a fusion of both lines of cases and makes actionable the tort of conspiracy under either of the antecedent strains." *Id.*

This point is not applicable to the instant case. No court has recognized any such distinction in § 1983 civil conspiracy jurisprudence. Accordingly, this Court will not do so.

in, or had pre-incident knowledge of, the violations. Moreover, Lieutenant Lampe was not connected in any way to the August 31, 1998 arrest of Kareem by Officer Campbell.

The same is true for Captain Ditchkofsky and Inspector Tiano. Although they learned of the circumstances of the February 10, 1998 incident at the February 12, 1998 meeting, there is no evidence that they knew of the constitutional violations pre-incident or contemporaneously with the incident. Moreover, both took affirmative steps to remedy the Glasses' complaints of officer misconduct after learning of them. Although there is evidence that Inspector Tiano was apprised of the incident on the night of February 10, 1998 from Judge DeAngelis's phone call, there is no indication that he had preexisting knowledge of the violation or that he was in a position to prevent the violation before it happened. Likewise, there has been no evidence that either Captain Ditchkofsky or Inspector Tiano had pre-incident or contemporaneous knowledge of the August 31, 1998 incident.

Nor was there sufficient evidence that the other non-supervisory officers (Officers Vales, Rockeymore, Marcus and McKenny) present on the scene of the February 10, 1998 incident acted pursuant to any agreement or common design.

 Finally, to argue that because the Ninth District officers, Detective Brennan and Lieutenant Lampe knew one another professionally and/or on occasion socialized with one another outside of work, they participated in a massive conspiracy to deprive the Glasses of their civil rights is sheer speculation. Although circumstantial evidence may support a claim of civil conspiracy, in this case, there is simply insufficient evidence to support plaintiffs' claims that any of the defendants engaged in a conspiracy. Therefore, plaintiffs' claim of a civil conspiracy in violation of § 1983 must fail.

Plaintiffs made much of an allegedly "phony" FTA bench warrant for Kareem in the Bohannon assault case. However, they did not allege that the conduct constituted an actionable tort, such as abuse of process or misuse of process.[86] Therefore, since plaintiffs have failed to prove an independent wrong or tort in connection with this conduct, there can be no claim for civil conspiracy. Nevertheless, in an apparent attempt to bolster their civil conspiracy claim in general and as evidence of an agreement by defendants to harass the Glasses for instituting the *Glass I* suit, plaintiffs claim that an FTA bench warrant was orchestrated by defendants to create a pretext to arrest Kareem, and in fact led to four arrests.

Plaintiffs expended much effort at trial explaining the inner-workings of the DPU and the warrant system in order to develop a complicated theory of events in which Detective Brennan, as a "sworn" officer, allegedly misused his access to the PCIC operators in order to enter a phony FTA "wanted message" without the benefit of an actual warrant. Under the then in place warrant system, once recorded, this "wanted message" appeared as if an FTA bench warrant was outstanding and was indistinguishable from a true "wanted message" originating from the court's daily add tapes. As a result, every time Kareem was stopped by the police and the officer inquired from the PCIC computer

---

**86.** Under the facts of this case, the alleged entry of a phony warrant would represent misuse of process, a tort not alleged by plaintiffs to be implicated. *See Jennings v. Shu-*

*man,* 567 F.2d 1213, 1219 (3d Cir.1977) (parsing out the difference between abuse of process and misuse of process).

system whether there were any outstanding warrants, the officers were alerted of the existence of an outstanding FTA bench warrant for Kareem.

Plaintiffs used this theory to explain why no FTA bench warrant was located in the court records and no copy of the warrant was ever produced by defendants. Because the warrant allegedly was never issued by the court, but rather inserted into the system by one of the alleged conspirators, the traditional safeguards in place for deleting invalid or executed bench warrants, i.e. the daily court delete tapes, were ineffective.[87] For the reasons that were extensively explored, but never explained, Kareem was left in a sort of "no man's land," and the invalid warrant remained in the system, giving officers on the street probable cause to arrest Kareem should they happen upon him with reasonable suspicion to effectuate a stop.

Despite plaintiffs' complex hypothetical about the allegedly phony FTA warrant, plaintiffs have failed to meet their burden, either by direct or circumstantial evidence, of proving how the warrant was entered into the system and why it was not promptly deleted. That Detective Brennan may have had access to the PCIC operators who entered warrants into the computer system, does not show that Detective Brennan, in fact, caused the FTA bench warrant to be entered into the system. Again, despite extensive testimony as to how the warrant system worked, there was insufficient evidence presented at trial to demonstrate how the FTA bench warrant at issue originated or was introduced into the warrant system, much less

that Detective Brennan was responsible for its entry.

While the plaintiffs' theory may be technically possible, they did not meet their burden of proof in showing that this complex series of events was more likely than not the reality in this case. Therefore, because plaintiffs (1) failed to show a violation of any independently actionable tort except for the arrests without probable cause on February 10, 1998 and August 31, 1998 and even with respect to those two incidents, (2) failed to show the existence of a common design or purpose, plaintiffs' civil conspiracy claim must fail.

### d. *Supervisory liability*

Plaintiffs allege supervisory liability on the part of Sergeant Craighead, Lieutenant Lampe, Captain Ditchkofsky and Inspector Tiano. According to plaintiffs, these defendants were in a position to correct the misdeeds of their subordinates and failed to do so.

In order to prevail on a supervisory liability claim, plaintiffs must:

(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

---

**87.** Nor did the district safeguards help Kareem in this situation. Given that the warrant pursuant to which Kareem was arrested on four occasions was a bench warrant and not an arrest warrant originating from the Police Department, the safeguards in the district, i.e. the audit conducted by each investigatory unit or division in which the actual warrants would be pulled and matched to the "wanted messages" on the list of wanted files, did not operate to "catch" the invalid warrant and remove it from the system.

*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir.2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989)). Plaintiffs must "identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the "identified deficiency" and the "ultimate injury." ' " *Id.* (quoting *Sample*, 885 F.2d at 1118). Moreover, plaintiffs must do more than just show that the constitutional injury would not have occurred if the supervisor(s) had done more. *Id.*

In *Brown*, the plaintiffs alleged, *inter alia*, § 1983 liability against the current and former police chiefs after a police officer shot and killed the plaintiffs' pet dog. The plaintiffs identified the relevant supervisory practices as a failure to train on the proper use of force against animals and knowledge of prior use of excessive force against animals coupled with an alleged failure to take disciplinary action. *Id.* at 217. The Third Circuit concluded that there was no evidence that either the current or former police chief had knowledge of any prior use of excessive force against animals by police officers, nor was there a pattern of such force. *Id.* at 217. Therefore, the court upheld a grant of summary judgment in favor of the police chiefs. *Id.*

Plaintiffs, on balance, present the following argument in support of municipal liability, as fit within the five *Brown* factors listed above. One, the specific supervisory practice at issue is knowledge by these supervisory officers that their subordinates were harassing the Glasses by violating their civil rights and attempting to interfere with the *Glass I* trial, coupled with a failure to discipline their subordinates for doing so. This allegation also subsumes the remaining *Brown* factors as follows: (2) the knowledge and failure to act by these supervisors created an unreasonable risk that the officers would harass the Glasses and violate their rights; (3) the supervisors were aware of these risks through Mr. Glass's complaint, IAD 98–04, and the February 12, 1998 meeting; (4) the supervisors were deliberately indifferent to the Glasses' complaints; and (5) the alleged harassment and ensuing civil rights violations resulted from the supervisors' failure to act.

Plaintiffs have failed to satisfy the *Brown* factors for supervisory liability with respect to Sergeant Craighead, Lieutenant Lampe, Captain Ditchkofsky and Inspector Tiano.

First, there can be no supervisory liability in the absence of a constitutional violation. As explained in detail above, the Court has found that plaintiffs failed to prove the existence of a conspiracy to violate plaintiffs' civil rights. Therefore, there is no supervisory liability from the acts alleged in support of a civil conspiracy as there was no conspiracy.

Second, even if there was a conspiracy, plaintiffs' argument that "as the highest ranking personnel working within the Ninth District headquarters, both Inspector Tiano and Captain Ditchkofsky had the authority, power and ability to put an end to the conspiracy to violate the Plaintiffs' federal Constitutional and civil rights and could have prevented the ultimate disruption of the *Glass I* trial," Pls.' Prop. Findings ¶ 2372, must fail. Plaintiffs present precisely the argument deemed "insufficient" to support an allegation of supervisory authority, i.e. "that the constitutional injury would not have occurred if the supervisor(s) had done more." *Brown*, 269 F.3d at 217.

Third, as to the constitutional violations that the Court has found to have occurred—the arrests without probable cause on February 10, 1998 and August 13, 1998 and the warrantless search on February 10, 1998—the supervisors named here

are not liable. In addition to identifying the specific supervisory practice defendants failed to employ, plaintiffs also must demonstrate "(1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *C.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir. 2000) (en banc) (citing *Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 25 (3d. Cir. 1997)).

As discussed above in the context of § 1983 civil conspiracy, plaintiffs have not shown that any defendant, perhaps with the exception of Inspector Tiano, had knowledge of the February 10, 1998 stop prior to or contemporaneously with the stop. As to Inspector Tiano, under the circumstances of this case, he was not in a position (from the receipt of a request on the phone from a non-police source) to stop the violation. Therefore, there is insufficient evidence to impose supervisory liability on Sergeant Craighead, Lieutenant Lampe, Captain Ditchkofsky or Inspector Tiano for the officers' violations of Mr. Glass and Kareem's constitutional rights on February 10, 1998 or August 31, 1998.

### C. Section 1985(2) Liability

Plaintiffs allege that defendants conspired to interfere with their civil rights by intimidating witnesses in the 1996 trial. According to plaintiffs, several witnesses refused to testify at the 1996 trial after Kareem voluntarily surrendered under threat of arrest during the *Glass I* trial.

Under 42 U.S.C. § 1985(2), "[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully," they are conspiring to deprive the plaintiff of his or her civil rights.

The Third Circuit articulated that "the essential allegations of a 1985(2) claim of witness intimidation are (1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiff." *Malley–Duff & Assocs., Inc. v. Crown Life Ins. Co.,* 792 F.2d 341, 356 (3d Cir.1986) (quoting *Chahal v. Paine Webber,* 725 F.2d 20, 23 (2d Cir.1984)).

The first requirement of a § 1985(2) action is the existence of a conspiracy, the *sine qua non* of which is an agreement between two or more persons. Again, plaintiffs have failed to prove an agreement among any of the defendants to support a finding that defendants engaged in a conspiracy. Moreover, even if a conspiracy had been proven, there is no evidence of causation. To demonstrate causation, plaintiffs cite to testimony from Mr. Glass and from Mr. Russell, a witness in the *Glass I* case, which explains that the witnesses were afraid to testify upon seeing the Glasses' confrontations with police, specifically the February 10, 1998 stop by the police in front of Mr. Glass's house. Despite his witnessing the stop in front of Mr. Glass's house, Mr. Russell still appeared at the federal courthouse for the trial of *Glass I* ready and willing to testify against the police officers. Moreover, plaintiffs made no effort to secure the attendance of any witnesses who were scheduled to testify either voluntarily or through subpoenas.

Therefore, there is no liability under § 1985(2) for a conspiracy to intimidate witnesses.

## D. *Section 1986 Liability*

Plaintiffs allege that defendants Inspector Tiano, Captain Ditchkofsky, Lieutenant Lampe and Sergeant Craighead violated 42 U.S.C. § 1986 because they had knowledge of the violation of § 1985(2) and, having the power to prevent those violations, neglected or refused to do so.

 To prove a violation of § 1986 plaintiffs must show that: (1) the defendants had actual knowledge of a § 1985 conspiracy, (2) the defendants had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendants neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed. *Clark v. Clabaugh,* 20 F.3d 1290, 1295 (3d Cir.1994) (citing *Perez v. Cucci,* 725 F.Supp. 209, 254 (D.N.J.1989) (citations omitted), *aff'd,* 898 F.2d 142 (3d Cir.1990)).

 The plaintiffs put forth insufficient evidence to prove the existence of a § 1985 conspiracy, as noted above; therefore, there can be no finding of liability pursuant to § 1986.

## E. *Plaintiffs' State Law Claims*

Plaintiffs also allege liability pursuant to state law. Plaintiffs allege false arrest and false imprisonment, and assault and battery by Officers Vales and Rockeymore from the February 10, 1998 incident and Officer Campbell from the August 31, 1998 incident.

### 1. *False arrest and false imprisonment*

 Under Pennsylvania law, the torts of false arrest and false imprisonment are essentially the same actions. *See Olender v. Twp. of Bensalem,* 32 F.Supp.2d 775, 791 (E.D.Pa.1999) (citing *Gagliardi v. Lynn,* 446 Pa. 144, 147, 285 A.2d 109, 110 (1971)). "An action for false

arrest requires that the process used for the arrest was void on its face or without jurisdiction; it is not sufficient that the charges were unjustified." *Strickland v. Univ. of Scranton,* 700 A.2d 979, 984 (Pa.Super.1997). Probable cause for an arrest will defeat actions for both false arrest and false imprisonment. *See Gilbert v. Feld,* 842 F.Supp. 803, 821 (E.D.Pa. 1993). "As under § 1983, the proper inquiry is whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Marable v. West Pottsgrove Twp.,* 2005 WL 1625055, *14, 2005 U.S. Dist. LEXIS 13574, at *39 (E.D.Pa. July 8, 2005). Consequently, "a police officer may be held liable ... for false imprisonment when [the factfinder] concludes that he did not have probable cause to make an arrest." *Renk,* 641 A.2d at 293.

 As determined above, the officers did not have probable cause to arrest on February 10, 1998 or August 31, 1998. Therefore, Officers Vales and Rockeymore are liable for the false arrest and false imprisonment of Mr. Glass and Kareem on February 10, 1998. Similarly, Officer Campbell is liable for the false arrest and false imprisonment of Kareem on August 31, 1998.

### 2. *Assault and battery*

 Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 293 (1994) (quoting *Cohen v. Lit Bros.,* 166 Pa.Super. 206, 70 A.2d 419, 421 (Pa.Super.1950)). An assault requires both the actor's intent to place the individual in imminent apprehension of harmful or offensive contact and

the individual's actual imminent apprehension. *See* Restatement (Second) of Torts, § 21. If there is no assault, then there can be no claim for battery. *See Belcher v. United States*, 511 F.Supp. 476 (E.D.Pa. 1981). "A police officer may be held liable for assault and battery when [the factfinder] determines that the force used in making an arrest is unnecessary or excessive." *Renk*, 641 A.2d at 293.

■ The appropriate standard for determining an officer's potential liability for assault and battery when making an arrest is whether excessive or unreasonable force was used in effectuating that arrest. Here, there was no finding of excessive force by the officers; therefore, there can be no claim for liability for assault and battery.

### F. Ms. Malloy's Claims

Ms. Malloy asserts claims against all defendants on all counts except false arrest and false imprisonment. However, her contacts with the Ninth District officers named as defendants in this case are minimal as almost all of the contacts between the Glasses and the police officers did not involve Ms. Malloy. In essence, all of Ms. Malloy's claims are based upon her interaction with Ninth District officers during the February 10, 1998 incident, which consisted of officers allegedly pointing a gun at her and shouting obscenities at her.[88]

According to plaintiffs, the act of pointing a gun at Ms. Malloy during the February 10, 1998 stop confers liability upon the City of Philadelphia and the individual defendants. In addition to Ms. Malloy's own testimony, Mr. Glass, Mr. Russell and Mr.

Snead also testified that they saw an unidentified officer point a gun at Ms. Malloy. There is no objective evidence to confirm or corroborate the allegation that a police officer pointed a gun at Ms. Malloy during the February 10, 1998 stop. Officer Vales, the only police officer who remembered seeing Ms. Malloy at the scene of the February 10, 1998 stop, denied pointing a gun at her.

■ Assuming that an officer did in fact point a gun at Ms. Malloy, the identity of the officer who allegedly pointed the gun at her is unknown. Ms. Malloy testified at trial that she could not identify the officer who pointed a gun at her on February 10, 1998. Trial Tr. 134:19–21, Jan. 19, 2006. The Court may not find liability against an unidentified individual.

■ As to the City's liability, the Court determined that the custom of employing investigatory detentions was unconstitutional under the Fourth Amendment and found the City liable to Mr. Glass and Kareem. Plaintiffs argue that because an officer pointed a gun at Ms. Malloy during the course of effectuating an unconstitutional investigatory detention, the City is also liable to Ms. Malloy. Pls.' Prop. Findings ¶ 2460. The Court disagrees. For municipal liability to attach, there must be causation. Ms. Malloy was not transported to the police station against her will pursuant to that custom; therefore, she suffered no injury as a result of the custom.

As to the individual officers, at most, Ms. Malloy may have a claim that officers used excessive force against her during the

---

**88.** The only other contact in which Ms. Malloy was directly involved was after the August 31, 1998 arrest of Kareem, who was driving Ms. Malloy's car, by Officer Campbell. Her brief interaction with Officer Campbell regarding whether Kareem had permission to drive her car does not form a basis for liability. Otherwise, Ms. Malloy testified that police officers would often, in her opinion, block the street when she was driving. *See, e.g.*, Trial Tr. 143:4–22, Jan. 19, 2006. Again, that does not form a basis for liability.

course of the February 10, 1998 stop. *See Baker v. Monroe Twp.*, 50 F.3d 1186 (3d Cir.1995) (finding officers used excessive force against family who was merely on the scene where officers were serving warrant). Even if the Court were to find that the unidentified officer used excessive force when he allegedly pointed a gun at Ms. Malloy, there can be no § 1983 liability against an unidentified individual officer.

Therefore, there is no liability flowing to Ms. Malloy from her contacts with Ninth District police officers.

## VI. CONCLUSION

Based upon the extensive findings of fact and conclusions of law set forth above, the Court finds liability on the part of defendants as follows.

The City of Philadelphia is liable under 42 U.S.C. § 1983 for employing the unconstitutional custom of "investigatory detention," whereby a suspect is taken to the police station involuntarily where probable cause to arrest is lacking. The "investigatory detention" was a violation of Mr. Glass and Kareem's Fourth Amendment right to be free from unreasonable "seizures."

Officers Vales and Rockeymore are liable under § 1983 for arresting Mr. Glass and Kareem without probable cause on February 10, 1998 in front of the Glasses' home. Officers Vales and Rockeymore are also liable under Pennsylvania law for false arrest and false imprisonment, also stemming from the February 10, 1998 incident.

Officer Campbell is liable under § 1983 for arresting Kareem without probable cause on August 31, 1998. Officer Campbell is also liable under Pennsylvania law for false arrest and false imprisonment.

All other claims against all other defendants must fail.

## VII. DAMAGES

Having found (1) the City of Philadelphia liable for an unconstitutional custom of "investigatory detentions," (2) Officers Vales and Rockeymore liable for arresting Mr. Glass and Kareem without probable cause on February 10, 1998, and (3) Officer Campbell liable for arresting Kareem without probable cause on August 31, 1998, plaintiffs Mr. Glass and Kareem are entitled to damages.

Plaintiffs seek compensatory damages for the following: (1) past and future pain and suffering; (2) past and future embarrassment and humiliation; (3) past and future loss of ability to enjoy the pleasures of life; and (4) past and future disfigurement. In essence, plaintiffs sole claim is compensation for loss of freedom under the Fourth Amendment. There is no claim of lost income or medical expenses that flows from this injury.

Although freedom is precious and any loss of freedom is, in a sense, irreparable, the Court must put a dollar value on that loss. In doing so, the Court considered the length of the detention, the conditions of the detention and the embarrassment and humiliation experienced as a result of the detention.

Here, the loss of freedom resulted in, at most, 2 to 3 hours of detention each for Mr. Glass and Kareem. The undisputed fact that Mr. Glass was transported to the police station under single-locked handcuffed conditions constitutes an aggravating factor and entitles him to an additional $5,000 in damages.[89] Therefore

---

**89.** Based upon the totality of the circumstances when effectuating the February 10,

1998 arrest of Mr. Glass, the Court concludes that Officer Rockeymore's method of hand-

cuffing Mr. Glass with "single-locked" handcuffs does not support a finding of excessive force in violation of the Fourth Amendment. The Court will consider it an aggravating factor, however, when determining damages as a result of Mr. Glass's unlawful arrest.

The Third Circuit has not ruled on the issue of whether failing to double-lock handcuffs when effectuating an arrest constitutes excessive force as a matter of law. In fact, until 2002, the Third Circuit had not considered whether the use of tight handcuffing in general during an arrest could violate the Fourth Amendment protections against excessive force. *See Istvanik v. Rogge,* 50 Fed.Appx. 533, 537 n.7 (3d Cir.2002) ("We have not had the occasion to address the issue of whether tight handcuffing can violate the Fourth Amendment protections against excessive force."). Where it has addressed the issue of tight handcuffing during an arrest, it has done so in the qualified immunity context. *See Kopec v. Tate,* 361 F.3d 772, 778 (3d Cir.2004) (holding that "the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established" for purposes of a qualified immunity inquiry).

While the Third Circuit has not addressed the issue of whether the use of single-locked handcuffs constitutes excessive force as a matter of law, the United States District Court for the District of New Jersey spoke to the matter in *Bak v. Township of Brick,* 1993 WL 21063 *3 (D.N.J. Jan.20, 1993). There, the court held that even if the officer placing the handcuffs on the plaintiff "intentionally did not double-lock the handcuffs, thereby allowing them to tighten, it cannot be said, as a matter of law, that [he] used excessive force." *Id.* Thus, because the use of single-locked handcuffs when effectuating an arrest is not, as a matter of law, excessive force, the general reasonableness test under the Fourth Amendment is used when analyzing the method by which Officer Rockeymore handcuffed Mr. Glass.

To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that the seizure was unreasonable. *See Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999) (citing *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). The test for reasonableness of a seizure under the Fourth Amendment is whether, under the totality of the circumstances, the "offiers' actions are 'objectively reasonable' in light of

the facts and circumstances confronting them, without regard to their underlying intent of motivations." *Kopec,* 361 F.3d at 776 (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Factors to be considered include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest. *Id.* at 776–77.

In this case, when considering the totality of the circumstances, Officer Rockeymore's method of handcuffing Mr. Glass, although in contradiction to Philadelphia Police Department's policy of "double-locking" handcuffs, does not amount to excessive force. When Officers Rockeymore and Vales initially stopped the Glasses on February 10, 1998, they had reason to believe, based on the fact that a car matching the description of the Mr. Glass's vehicle fled from police two nights before, that the suspects were dangerous. Further, as discussed in the Findings of Fact section, there was conflicting evidence over whether Mr. Glass and Kareem remained in the car as the officers approached, or whether they were "nonchalantly" walking toward the Glass home, disregarding the officers' instructions. Trial Tr. 98:5–99:14, Feb. 2, 2006. Thereafter, a crowd began to congregate in front of the Glass home. Therefore, it is apparent that Officer Rockeymore exercised lawful discretion in determining the amount of physical restraint necessary to control defendant in light of the volatile circumstances.

In addition, although Mr. Glass claims that the tightness of the handcuffs caused nerve damage to his wrists, plaintiffs offered no medical evidence in support of this claim. Trial Tr. 38:1–7, Jan. 18, 2006. Further, Mr. Glass wore the handcuffs for only a brief period of time. Moreover, there was conflicting evidence at trial concerning the extent to which Mr. Glass complained about the tightness of the handcuffs, and whether Officer Rockeymore yanked them, causing them to tighten. Mr. Glass testified that the handcuffs which Officer Rockeymore placed on him were too tight, and that his complaints of discomfort to Officer Rockeymore went ignored. Trial Tr. 38:1–7, Jan. 18, 2006. While Officer Rockeymore testified that he could not recall whether Mr. Glass complained about the tightness of the handcuffs, he did admit that, despite Philadelphia Police Department's policy of "double-locking" handcuffs, he "single-locked" Mr. Glass's handcuffs, allowing them to become tighter with any additional

the Court will award damages as follows: As to the liability of the City of Philadelphia, Officer Vales, Officer Rockeymore and Officer Campbell, Mr. Glass is awarded $15,000 for the February 10, 1998 detention and Kareem is awarded $20,000 for the February 10, 1998 and August 31, 1998 detentions.

■■■■■ Punitive damages are not warranted in this case. First, the City of Philadelphia cannot be held liable for punitive damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Second, as to the individual officers, in *BMW of North America v. Gore,* 517 U.S. 559, 576–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court articulated three "guideposts" to consider when awarding punitive damages: (1) the "degree of reprehensibility" of the conduct at issue; (2) the "disparity between the harm or potential harm suffered" by the defendants for a punitive damages award; and (3) the "difference between the remedy and the civil penalties authorized or imposed in comparable cases." None of these "guideposts" supports an award of punitive damages against any of the individual officers found liable in this case. Third, as to the state law causes of action, the conduct of the individual officers is not so "outrageous," nor does it demonstrate an "evil motive or ... reckless indifference to the rights of others" to support an award of punitive damages. *Hutchison v. Luddy,* 582 Pa. 114, 870 A.2d 766 (2005).

An appropriate order follows.

pull. Trial Tr. 146:6–148:12, Feb. 2, 2006. Officer Rockeymore denied yanking Mr. Glass's handcuffs in order to tighten them. Trial Tr. 148:7–9, Feb. 2, 2006.

Based upon the above totality of the circumstances inquiry, the Court concludes that Officer Rockeymore's method of handcuffing

## ORDER

**AND NOW,** this 10th day of October 2006, pursuant to the Opinion dated October 10, 2006 and having found (1) the City of Philadelphia liable for an unconstitutional custom of "investigatory detentions," (2) Officers Thomas Vales and Donnie Rockeymore liable for arresting Reuben Glass and Kareem Glass without probable cause on February 10, 1998, and (3) Officer James Campbell liable for arresting Kareem Glass without probable cause on August 31, 1998, it is hereby **ORDERED** that **JUDGMENT** is entered **IN FAVOR OF PLAINTIFFS** and **AGAINST DEFENDANTS** as follows:

1. **PLAINTIFF REUBEN GLASS** is awarded $15,000 for the February 10, 1998 detention; and

2. **PLAINTIFF KAREEM GLASS** is awarded $20,000 for the February 10, 1998 and August 31, 1998 detentions.

**IT IS FURTHER ORDERED** that, as to all other claims against all other defendants, **JUDGMENT** is entered **IN FAVOR OF DEFENDANTS** and **AGAINST PLAINTIFFS.**

**AND IT IS SO ORDERED.**

Mr. Glass, with "single-locked" handcuffs, does not support a finding of excessive force in violation of the Fourth Amendment. The Court will consider it an aggravating factor, however, when determining damages as a result of Mr. Glass's unlawful arrest.